Gary MAVIS and Ruth Mavis, on behalf of themselves and their minor daughter, Emily Mavis, Plaintiffs,

v.

Thomas SOBOL, as Commissioner of Education of the State of New York, and the Board of Education, South Lewis Central School District, Defendants.

No. 89–CV–1061.

United States District Court, N.D. New York.

Dec. 23, 1993.

As Amended Jan. 5, 1994.

Legal Services of Cent. New York, Syracuse, NY, for plaintiffs; Frederick M. Stanczak, Edward Luban, of counsel.

Grossman Kinney Dwyer Reitz & Harrigan, East Syracuse, NY, for defendant South Lewis Cent. School Dist.; Robert E. Hornik, Jr., of counsel.

Robert Abrams, Albany, NY, for defendant Thomas Sobol; Lawrence L. Doolittle, of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### INTRODUCTION

Plaintiffs Gary and Ruth Mavis commenced this action on behalf of their daughter, Emily, alleging that the defendant, South Lewis Central School District Board of Education ("District"), violated what is now known as the Individuals With Disabilities Education Act ("IDEA" or "the Act"),[1] 20

---

1. When plaintiffs filed this lawsuit in 1989 they asserted claims under, inter alia, the Education for Handicapped Act ("EHA"). In October, 1990, Congress amended that Act and, among other things, changed its name to the Individuals with Disabilities Education Act. Even though many of the cases referenced herein were decided under the EHA, because "the EHA remains the foundation for IDEA[,]" those cases are still guiding precedent for interpretations of the IDEA issues presented herein. See Straube v. Florida Union Free School Dist., 801 F.Supp. 1164, 1169

U.S.C. § 1400 *et seq.*, by failing to provide Emily with a "free appropriate public education" as required under the Act.[2] Also named as a defendant in this action is the New York State Commissioner of Education, Thomas Sobol ("the Commissioner").[3] On November 13, 1990, the court heard oral argument on the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56.

Following oral argument, the court read a decision into the record denying every aspect of the Commissioner's motion, except that pertaining to the merits of plaintiffs' IDEA claims.[4] The court reserved decision on that aspect of the Commissioner's motion. The court also reserved decision on the District's motion for summary judgment, which also pertains solely to the substance of plaintiffs' IDEA claims. Similarly, the court reserved decision on plaintiffs' cross-motion for summary judgment. At that time, the court strongly urged the parties to settle this matter without court intervention, and with that goal in mind the court decided to hold its decision in abeyance while the parties conferred. Unfortunately the parties were not able to resolve this matter, even with additional assistance from the court in July, 1991.

For the next two years there were off again-on again settlement negotiations directly between the parties, but none of them proved fruitful. With another school year fast approaching, and the fourth since the commencement of this lawsuit, on August 16, 1993 the plaintiffs and the District advised the court that a settlement would not be forthcoming. They therefore requested that the court issue a decision on the pending cross-motions for summary judgment. At that time, permission was sought and granted for the filing of supplemental memoranda of law and supplemental documentation. Having had the opportunity to carefully review all of the submissions made in connection with these motions, including the quite lengthy administrative record, the court is now in a position to render its decision with respect thereto.

As with many IDEA cases, the controversy here centers on exactly what constitutes a "free appropriate public education" for Emily. To fully appreciate the parties' respective positions on that issue, it is necessary to carefully examine the history of this litigation, including a fairly detailed review of the various classroom settings in which Emily has been placed over the years.

## BACKGROUND

### I. 1986–87 Academic Year

At around two years of age, Emily Mavis was diagnosed as having mild mental retardation. In 1986 at six years of age, she began attending Glenfield Elementary School, her neighborhood school. When she first entered Glenfield in the fall of 1986, the District had not yet classified her as a child with a disability. Emily was placed in Ms.

n. 1 (S.D.N.Y.1992) (citing *Heldman v. Sobol*, 962 F.2d 148 n. 1 (2d Cir.1992)); *See also Delaware County Intermediate Unit v. Martin K.*, 831 F.Supp. 1206, 1212 n. 3 (E.D.Pa.1993) (same).

**2.** IDEA expressly requires that for a State to qualify for assistance thereunder, it must demonstrate, among other things, that "[t]he State has in effect a policy that assures all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1) (West Supp. 1993).

**3.** Under New York's two-tiered system for the review of a child's Individualized Education Program ("IEP"), after a hearing officer conducts an initial hearing and makes a recommendation to the board of education, N.Y.Educ. Law § 4404(1) (McKinney Supp.1994), 8 N.Y.C.R.R. § 200.-5(c)(1), that decision may be appealed by the parties to the commissioner of education. N.Y. Educ. Law § 4404(2) (McKinney Supp.1994). Thus, the Commissioner is named as a defendant herein because it is his decision upholding the recommendation of the Committee on Special Education ("CSE") from which plaintiffs are appealing.

**4.** In their complaint plaintiffs allege two separate IDEA claims. Plaintiffs' first claim is that "[b]y failing to place Emily Mavis in a regular education class, defendants have denied her right to be educated in the least restrictive environment, in violation of the EHA [IDEA] and its implementing regulations." Complaint at ¶ 51. Plaintiffs' second IDEA claim is that defendants have denied Emily a free appropriate public education in violation of that Act. *Id.* at ¶ 53.

McAuliffe's regular kindergarten then.[5] Emily continued in that setting throughout the 1986–87 academic year. Although she did not receive any special education services at that time, she did receive speech therapy once or twice a week. Affidavit of Ruth Mavis (Oct. 26, 1990) ("Mavis Affidavit I") at ¶ 8. For purposes of this lawsuit, that year can be described as uneventful.

During May and June, 1987, with the plaintiffs' consent, Emily was evaluated by Peter Dawson—a District psychologist and at the time the District's chairperson for the Committee on Special Education ("CSE"). That evaluation showed that Emily was "moderately mentally retarded with concurrent deficits in adaptive behavior." *Id.* at 3, ¶ 10.

## II. 1987–88 Academic Year

The following academic year (1987–88), Emily remained in Ms. McAuliffe's kindergarten class. However, prior to the start of this academic year, Mr. Dawson recommended to the CSE that Emily be classified as mentally retarded and that she be placed in an "Option II" special class.[6] Mr. Dawson did recommend, however, that Emily be "mainstreamed" for music and physical education.[7] At a CSE meeting to review Emily's

evaluation, which the plaintiffs attended, it was decided that Emily would continue in Ms. McAuliffe's kindergarten class until a second psychological evaluation could be done and additional classroom observations made. That course of action came about because the CSE itself, after plaintiffs presented reports from a neurologist and an occupational therapist which conflicted with Mr. Dawson's recommendations, could not reach a consensus as to Emily's needs or as to her placement.

At the start of that school year, in September, 1987, the District arranged a second psychological evaluation with a Dr. Jack Landy. Dr. Landy's attempts to evaluate Emily at this time were unsuccessful and he was unable to reach any definite conclusion as to her diagnosis. On December 3, 1987, another CSE meeting was convened to discuss Emily's status. Plaintiffs were again present. The CSE formally identified Emily as a child with a handicapping condition and classified her as "mentally retarded." That classification is not in dispute. The CSE then recommended that while Emily should continue in that same kindergarten setting, she needed the assistance of a half-time aide and she should also receive speech therapy. Those recommendations were included in the CSE's Phase I IEP.[8] After plaintiffs agreed

5. As have the parties, the court uses the term "regular" simply to refer to classes where predominately nondisabled children are present.

6. At least at the time of the administrative hearing, an Option II class differed from an Option I class at Glenfield Elementary in that the IQ range in the latter was 58–96, whereas the IQ range for the former was 29–66. Transcript of August 11, 1988 Administrative Hearing at 18–19. In addition, again at the time of the administrative hearing, the children in the Option I class were reading at a higher level than those in the Option II class, who were only at a pre-kindergarten or kindergarten level. *Id.* These designations derive from the Commissioner's regulations where special education classes are classified along a continuum based upon the student-teacher ratio. *See* 8 N.Y.C.R.R. § 200.6.

7. "Integrating children with disabilities in regular classrooms is commonly known as 'mainstreaming.'" *Oberti ex rel. Oberti v. Board of Education*, 995 F.2d 1204, 1207 n. 1 (3rd Cir. 1993) (citations omitted). The court is aware that in recent years use of the term mainstreaming has not been favored by some educators, and instead use of the term "inclusion" is now pre-

ferred in some educational circles. *See id.* Despite that, the court will continue to use the term mainstreaming in this case because not only does the Act itself employ that term, but as the Third Circuit in *Oberti* accurately stated

'[M]ainstreaming' under IDEA does *not* mean simply the placement of a child with disabilities in a regular classroom or school program. *Id.* (citation omitted) (emphasis in original).

8. Under the IDEA, an IEP must be formulated for a disabled child. *See* 20 U.S.C. § 1401(a)(18) (West 1990); and 20 U.S.C. § 1414(a)(5) (West Supp.1993). Basically an IEP is a written statement detailing such items as the child's present educational performance level and annual goals. Section 1401(a)(20) of the IDEA sets forth a comprehensive list of what an IEP must contain. *See* 20 U.S.C. § 1401(a)(20) (West Supp.1993). As the Second Circuit explained in *Heldman, supra:*

The IEP process reflects a novel approach to the guarantee of rights to a minority: Congress, in lieu of uniform substantive standards, sought to protect the interests of the child by providing for parental participation in the pro-

with the CSE's recommendation, it was implemented in January, 1988.

Simultaneously with the implementation of the Phase I IEP, Emily's teacher prepared a Phase II IEP containing specific goals and objectives for Emily, which differed from those of the other kindergarten students. Emily was expected, however, to work on part of the regular kindergarten curriculum. Despite the fact that neither Emily's kindergarten teacher nor her half-time aide had any special education background, by June, 1988, Emily had achieved 14 of the 24 goals outlined in the Phase II IEP.

At Mr. Dawson's request, Dr. Landy again attempted to evaluate Emily; this time he was successful. *Id.* at ¶ 22. Consistent with other professionals who had evaluated Emily, Dr. Landy found "[t]hat [she] was functioning at the lower end of the middle range of mental retardation." *Id.* The CSE then met in May, 1988, to reevaluate Emily's IEP. The CSE made the following recommendations, which represented a change from its prior recommendations:

1. Option II as a primary placement.[9]
2. Mainstreaming and integration in the following areas:
 language development in option I music and gym with grade 1 lunch, assemblies, field trips
3. Speech therapy 30 minutes/day, 5 days/week.

Affidavit of Robert E. Hornik, Jr. (Nov. 6, 1990) ("Hornik Affidavit I"), exh. B thereto (May 12, 1988 CSE Minutes) at 4. Plaintiffs disagreed with those recommendations because basically they wanted Emily to remain in a regular first grade classroom while at the same time receiving special education services. Therefore, as they had a right to do, plaintiffs requested an impartial due process hearing.[10]

### III. 1988–89 Academic Year

Prior to the time of that hearing, Emily was again evaluated; this time by Roberta Schnorr.[11] Currently Dr. Schnorr is an assistant professor in the Education Department at the State University of New York at Oswego. In her initial report which is quite extensive and is part of the record on these motions, Dr. Schnorr concluded "that Emily's needs could be met by placement in a regular class with some special services," such as a qualified aid to provide support to Emily both on an individual basis and in group setting. *Id.* at ¶ 27 and exh. A thereto at 27. In August, 1988, a two day hearing was conducted before an impartial hearing officer appointed by the District. Pending a decision from the hearing officer, in September, 1988, for the third consecutive year, Emily was placed in McAuliffe's kindergarten class. In accordance with the December, 1987 IEP, Emily continued to receive a half-time aide and speech therapy.

On September 19, 1988, the impartial hearing officer issued a decision. She found that although Emily was appropriately classified as mentally retarded, due to the insufficiency of the record, she was unable to reach a decision as to whether the CSE's recommended placement was appropriate. *See* Affidavit of Peter Dawson ("Dawson Affidavit I") (May 30, 1990), exh. 2 thereto (Sept. 18, 1989 Hearing Officer Decision) at 15–16.

cess of charting an appropriate education for their child.
962 F.2d at 151 (citations omitted).

**9.** Obviously this was a dramatic change from Emily's placement up to that point where her *primary placement* had been in a regular classroom.

**10.** "To ensure that the parents would not be silenced by the very forces that had once excluded disabled children from public education, Congress granted parents the right to seek review of their child's IEP." *Heldman, supra,* 962 F.2d at 151 (citing Laura Rothstein, *Rights of Physically Handicapped Persons* §§ 2.23–.31 (1984)). Sec-

tion 1415(b)(2) of the IDEA explicitly provides for such a review:

Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational units, as determined by State law or by the State educational agency.

20 U.S.C. § 1415(b)(2) (West 1990).

**11.** Dr. Schnorr has been essentially retained by the plaintiffs and has advocated on Emily's behalf throughout these proceedings.

More specifically, the hearing officer identified the following deficiencies:

> Although in Exhibit 25 the District purports to offer a profile of the Option II class in which EMILY would be placed, neither the exhibit nor the testimony of the District's witnesses provides sufficient specificity concerning EMILY and the other students in the proposed placement regarding the four areas of need by which students are deemed to be appropriately grouped; academic or educational achievement and learning characteristics; social development; physical development; management needs.... These areas must be considered in addition to ranges in chronological age and instructional level.

*Id.*, exh. 2 thereto at 15 (citations omitted). The hearing officer opined that in her view such information was vital because "[t]he capabilities and needs of the other children in the proposed placement are relevant factors in determining the appropriateness of such placement, and the District has failed to establish that the capabilities and needs of the other children in the proposed placement are similar to those of EMILY...." *Id.* (citations omitted). The hearing officer also outlined a host of other omissions:

> [t]he Phase I IEP developed for EMILY fails to establish with precision the individual needs of this pupil. The child's current level of functioning for both reading and math were presented as a single level, with no indication of the child's language development, in spite of extensive evaluations which have been carried out and are available to the CSE.... The IEP offers no statement of needs or objectives for the child in the area of physical development, though the Regulations of the Commissioner of Education clearly indicate that this includes more than gross physical development or medical needs.... The IEP also fails to describe and provide for the student's individual learning style, nor does it indicate the maximum class size and the

staff to student ration which would be appropriate. The IEP does not indicate whether EMILY is to be mainstreamed in art, and it fails to indicate the expected school credential.

*Id.* at 15–16 (citations omitted). Accordingly, the hearing officer remanded the matter to the CSE instructing it to

> [d]evelop[ ] ... a more complete Phase I IEP in accordance with the requirements of the Regulations of the Commissioner of Education.... The District must also develop a profile of the Option II class in which it is proposed to place EMILY with sufficient specific information in the areas delineated within the Regulations to allow the Hearing Officer to determine whether the proposed placement is appropriate.

*Id.* at 16 (citation omitted).[12]

Shortly thereafter, on October 13, 1988, the CSE again met with the plaintiffs present. The CSE then prepared a new IEP for Emily, modifying its placement recommendation. Specifically, the CSE recommended:

1. Option I—Maximum class size: 12 Student to teacher ratio: 12:1 [13]

2. Mainstreaming in art, music, gym on the first grade level.
 Lunch will be with the Option I class in the lunchroom with typical students the same approximate age. Emily will join field trips and assemblies on an individual or group basis with other age appropriate classes.

3. Speech therapy—30 min/day, 5 days/week

Hornik Affidavit I, exh. C thereto at 3 (Oct. 13, 1988 CSE Minutes). According to the District, the reason for that modification was that "[ (a) ] the class profiles for the Option I class and the Option II class had changed between May 1988 and October 1988, thus making the Option I class an appropriate placement for Emily in an environment less restrictive than the prior Option II place-

---

**12.** Plaintiffs disagree with the District's characterization of this as an "interim decision," but whether it is or not is not immaterial to a resolution of these motions.

**13.** Both the Option I and II classes are operated primarily by the Jefferson–Lewis Board of Cooperative Educational Services ("BOCES"), although at least in 1988 when the administrative hearing was conducted, they were housed in Glenfield Elementary.

ment and (b) the CSE believed that the plaintiffs would find the modified recommendation less objectionable." District's Rule 10(j) Statement at ¶ 10. Plaintiffs objected to that modified recommendation based upon their continued belief that Emily's "[n]eeds could be met in a first grade class." Mavis Affidavit I at ¶ 35.

The impartial hearing was reconvened on November 29, 1988, to consider the CSE's modified recommendation. After hearing additional testimony, on January 16, 1989, the hearing officer rendered a decision upholding the CSE's modified recommendation. In particular, the hearing officer found that:

It was clearly established, and all witnesses were in agreement, that Emily is not capable of carrying out the regular first grade curriculum. Also, It [sic] was demonstrated that Emily attained limited success in the regular kindergarten program, although she was in the same grade for a second year and had the assistance of a half-time aide. Thus the recommended placement is both appropriate and the least restrictive environment in which to provide Emily her educational program.

Dawson Affidavit I, exh. 2 thereto (Hearing Officer Decision of Jan. 16, 1989) at 11.

Plaintiffs then appealed that decision to the Commissioner. On May 2, 1989, the Commissioner issued a written decision dismissing that appeal stating, "Based on the record before me, I conclude that petitioners' daughter would not be appropriately placed in a regular first grade program with special education support services." Id., exh. 3 thereto (Commissioner's Decision) at 4–5. The Commissioner further found that "[t]he academic component of the placement recommended for petitioners' daughter to be appropriate to meet her educational needs because it provides her with the individualized attention and academic support she requires

at a level commensurate to her ability." Id. at 5.

### IV. 1989–Present

On August 31, 1989, plaintiffs commenced the present action seeking judicial review of the Commissioner's decision. In the meantime, Emily has remained in the regular education program at Glenfield Elementary School. During the 1989–90 academic year, Emily attended a regular first grade class at Glenfield Elementary. The following year she was placed in a combination first and second grade classroom. The District has continued to provide her with speech therapy and a half-time aide, Mavis Affidavit at ¶ 42, although provision of these services was sporadic during the last academic year (1992–93). See Affidavit of Ruth (Aug. 25, 1993) ("Mavis Affidavit II") at ¶¶ 22–23.

In the years since the commencement of this lawsuit, Emily has advanced from grade to grade so that currently she is enrolled in a regular sixth grade class. See Mavis Affidavit II at ¶ 22. The District is quick to point out though that this advancement has been so that Emily would not be too far removed from her chronological peers. Affidavit of Robert J. Hornik, Jr. (Sept. 17, 1993) ("Hornik Affidavit II") at ¶ 4. The District also explains that Emily's placements over the years have been in accordance with the various statutory and regulatory "stay-put" [14] provisions; those placements have also come about as a result of compromises reached between the District and the plaintiff parents.

Over the years, the plaintiffs have not been satisfied with Emily's various placements and their concerns are fully detailed in the supplemental affidavit of Mrs. Mavis, as well as in Dr. Schnorr's supplemental report. The court will not set forth here each and every claimed deficiency in Emily's placements, but a few are noteworthy. First, during the

---

14. The IDEA "stay-put" provision requires that:
 During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed.
 20 U.S.C. § 1415(e)(3) (West 1990). The state law counterpart to this provision, which contains remarkably similar language, is Educ. Law § 4404(4) (McKinney Supp.1992).

most recent full academic year (1992–93), no special education teacher was ever assigned to Emily. *Id.* at ¶ 20. Second, according to the plaintiffs, Emily's teachers need training to assist them in integrating her into the classroom. In Dr. Schnorr's words, as it is now, Emily must "integrate herself" into the classroom. *Id.* at ¶ 21(e). Finally, even though Emily's IEP for the 1992–93 year continued to mandate that she receive speech therapy five times per week, no such therapy was provided after approximately February, 1993. *Id.* at ¶ 22.

Not surprisingly, the District's view of Emily's most recent placements differs from that of the plaintiffs. The District readily admits that it did not consider Emily's placement during the 1992–93 academic year to be "appropriate." Hornik Affidavit II at ¶ 5. The District explains, however, that through the years Emily's placements have been the result of many compromises by both the District and the plaintiffs. Regardless of whether or not a given service or program was provided to Emily, the bottom line as far as the District is concerned is that during the last academic year (1992–93), Emily's behavior deteriorated. Paul Platz, Emily's "open area and home base teacher" from January, 1993 through the end of that school year opined, based upon his observations, "that Emily's behavioral problems seemed to increase as Emily became more familiar with places and people. That is, as Emily settles into a situation, she seems to act out more." Affidavit of Paul Platz (Sept. 17, 1993) at ¶ 12. Mr. Platz also noted that "Emily has had episodes of "acting out" outside the classroom . . . [,]" although he did not elaborate upon this. *Id.* at ¶ 13. The District attributes what it perceives as the deterioration in Emily's behavior to the fact that a regular classroom environment simply is not appropriate for Emily.

The District is now moving for summary judgment, contending that the CSE's recommended placement for Emily is appropriate as a matter of law. The District further contends that summary judgment is appropriate on plaintiffs' claim for attorney's fees because plaintiffs are not a prevailing party under 20 U.S.C. § 1415(e)(4)(B),[15] and thus are not entitled to recover attorneys' fees thereunder. Lastly, the District contends that it is entitled to summary judgment on plaintiffs' claim pursuant to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, because "[t]he evidence clearly demonstrates that the School District has taken all of the steps required to protect Emily Mavis' due process rights and to provide for her education, and has not engaged in any discriminatory conduct toward Emily." District Memorandum of Law at 12.

The Commissioner is also moving for summary judgment. First, the Commissioner believes that he is entitled to summary judgment because this action is barred by the Eleventh Amendment. Second, he asserts that this action is barred by the applicable statute of limitations. Third, the Commissioner asserts that his determination that the District had provided Emily with an appropriate education was "correct," and thus summary judgment is warranted. Finally, in a letter submission the Commissioner asserts that because he was not a party to the administrative proceeding, "[he] is neither a necessary nor proper party in this case." Letter from Lawrence Doolittle to Court (Nov. 5, 1990).

Plaintiffs counter that the District continually has refused to provide Emily with the supplemental services necessary to allow her to succeed in a regular classroom, and thus they are entitled to summary judgment as a matter of law on their IDEA claims. With respect to the Commissioner's motion, plaintiffs respond that this action was timely commenced and that he is a proper party hereto. Thus, plaintiffs assert that defendants' summary judgment motions should be denied in their entirety, and that instead the plaintiffs are entitled to summary judgment on their cross-motion.

---

15. That statute specifically provides:

In any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party.

20 U.S.C. § 1415(e)(4)(B) (West Supp.1993).

After carefully reviewing all of the numerous submissions made in connection with these motions, including the quite lengthy administrative record, the court is now in a position to fully discuss and decide the numerous issues raised by these motions.

## DISCUSSION

### I. Commissioner's Procedural Arguments

#### A. Statute of Limitations

■ The plaintiffs and the Commissioner are in agreement that in New York an IDEA action is governed by the four month statute of limitations set forth in § 217 of the New York Civil Practice Law and Rules. *See Adler By Adler v. Education Dept. of State of N.Y.,* 760 F.2d 454 (2d Cir.1985). Section 217 provides, in relevant part:

> [a] proceeding against a body or officer must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner or the person whom he represents in law or in fact, . . . .

N.Y.Civ.Prac.L. & R. § 217 (McKinney 1990). The Commissioner maintains, without citing any authority, that under that statute service of "appropriate process" must be effected in four months for an action thereunder to be timely. In the present case, the Commissioner rendered his decision on May 2, 1989, but service was not effected upon him until September 12, 1989. Therefore, the Commissioner believes this action is time barred.

There are two fundamental flaws in the Commissioner's argument. The first flaw is that he assumes that the statute of limitations begins running in an IDEA action on the date the Commissioner's decision is rendered. Judge Wexler explicitly held to the contrary however in *Gerasimou By Gerasimou v. Ambach,* 636 F.Supp. 1504 (E.D.N.Y. 1986). "[A] party's right to seek review under § 1415(e)(2) [of the IDEA] accrues when he [or she] receives notice of a final decision by the Commissioner." *Id.* at 1509 (emphasis added) (citations and footnote omitted).

In the present case, therefore, plaintiffs' right to seek review of the Commissioner's decision did not accrue until May 5, 1989, when plaintiffs' attorney was notified by receipt of a copy of that decision.

■ The second fatal flaw is a result of the Commissioner's disregard for the Federal Rules of Civil Procedure. "[I]t is well established that where the right asserted is created by federal statute, the time of commencement of the action is determined by federal law." *Id.* (citations omitted). In accordance with Fed.R.Civ.P. 3, "[a] civil action is commenced by filing a complaint with the court. In federal court, therefore, filing ends the running of the limitation period." *Id.* (citation omitted). Consequently, in *Gerasimou,* the court held that the four month statute of limitations under § 217 began running when plaintiff's attorney received notice of the Commissioner's decision. *Id.* at 1510. Based upon the court's reasoning in *Gerasimou,* it is clear that in the present case plaintiffs' action was timely commenced. Plaintiffs filed their complaint with this court on August 31, 1989, prior to the termination of the four month statute of limitations; and that filing ended the running of the limitations period under § 217. Thus, the Commissioner's argument that this action is time barred is completely without merit.[16]

#### B. Eleventh Amendment

■ The Commissioner's next procedural argument is that the Eleventh Amendment bars this action as against him. More specifically, relying upon *Dellmuth v. Muth,* 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989), the Commissioner asserts that because in IDEA actions such as the present one the State has not waived its immunity from suit under the Eleventh Amendment, this action is barred by that amendment. In *Dellmuth* the Supreme Court did recognize that the EHA does not abrogate the states' Eleventh Amendment immunity from suit. Consequently, the Court held that the Eleventh Amendment acted as a bar to plaintiffs' EHA claim seeking to collect tuition reimbursement from the Pennsylvania Secretary

---

**16.** Given the established state of the law in this area, it strikes the court that this particular argument borders on a violation of Rule 11's proscription against frivolous motions.

of Education. *See also, Gerasimou, supra,* 636 F.Supp. at 1512–13 (plaintiff's claim against State Commissioner of Education barred by the Eleventh Amendment insofar as she was seeking monetary damages).

The Court in *Dellmuth* did not, however, address the issue of whether the Eleventh Amendment bars a claim for attorneys' fees against the state or a state official. The Seventh Circuit did however address that precise issue in *Tonya K. By Diane K. v. Bd. of Educ. of Chicago,* 847 F.2d 1243 (7th Cir. 1988). Relying upon *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Court held that in an EHA action the Eleventh Amendment did not prohibit a court from "[a]ward[ing] as part of the costs of the case the attorneys' fees reasonably incurred in obtaining that permissible, prospective relief," against the state Superintendent of Education. *Id.* at 1246. The Seventh Circuit reasoned that although an award for damages against the state official would not be permissible in light of the Eleventh Amendment "[f]ees are not damages," and therefore they are permissible. *Id. See also, Fontenot v. La. Bd. of Elem. & Secondary Educ.,* 835 F.2d 117, 120 (5th Cir.1988) (Eleventh Amendment not bar to award of attorneys' fees against State Superintendent of Special Education Center as part of costs to parent of disabled child under EHA); *Rose v. State of Neb.,* 748 F.2d 1258, 1262–63 (8th Cir.1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 61, 88 L.Ed.2d 50 (1985) (Eleventh Amendment not bar to attorney fee award against, among others, State Commissioner of Education); and *Michael M. v. Bd. of Educ. of NYC School Dist.,* 686 F.Supp. 995, 1003 (E.D.N.Y.1988) (same). Even though all of the cases just cited were decided prior to *Dellmuth,* as previously stated, because there is absolutely no mention in *Dellmuth* of attorneys' fees, in the court's view, *Dellmuth* did not overrule these cases and they remain viable and persuasive precedent on this issue.

■ In the present case, the only type of monetary relief plaintiffs are seeking from the Commissioner is in the form of attorneys' fees. The other relief which plaintiffs are seeking from the Commissioner (and the District) is declaratory in nature. In particular, the plaintiffs are seeking a declaratory judgment "[t]hat defendants have violated Emily Mavis' rights under the Education of the Handicapped Act and Section 504 of the Rehabilitation Act of 1973...." Complaint at 10, ¶ a. They are also seeking a declaratory judgment "Directing defendant Board of Education to develop and implement an individualized education program which provides for Emily Mavis' education in the least restrictive environment, an age-appropriate regular education classroom with appropriate special education services...." *Id.* at 10–11, ¶ b. Clearly such prospective relief is not barred by the Eleventh Amendment. *See, e.g., Burr by Burr v. Sobol,* 888 F.2d 258, 259 (2nd Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990), (Eleventh Amendment not violated where court vacated Commissioner's decision and reinstated state hearing officer's decision); *Kerr Center Parents Assoc. v. Charles,* 897 F.2d 1463, 1469 (9th Cir.1990) (emphasis in original) ("[t]o the extent that the district court ordered the state to comply *prospectively* with its obligations under the EAHCA," such order did not violate the eleventh amendment); *Straube, supra,* 801 F.Supp. at 1172 (same).

Additionally, based upon the Court's reasoning in *Tonya K.,* the Eleventh Amendment is not a bar to plaintiffs' action against the Commissioner insofar as they are seeking attorneys' fees. Consequently, there is no validity to the Commissioner's position that the Eleventh Amendment bars recovery against him for prospective relief and attorneys' fees; therefore his motion for summary judgment on this basis is denied.

## C. "Ongoing Controversy"

■ Next the Commissioner makes a weak argument that because effective July 1, 1990, he no longer serves as the State Review Officer under 20 U.S.C. § 1415(c),[17] there is "no ongoing controversy between the plaintiff [sic] and the Commissioner...." Doolittle Letter. Apparently the Commissioner believes that that is a basis for grant-

---

**17.** "Effective July 1, 1990, a state review officer, instead of the Commissioner of Education, reviews the initial hearing." *Heldman, supra,* 962 F.2d at 152 n. 5 (citations omitted).

ing his summary judgment motion. The Commissioner is ignoring the fact, however, that plaintiffs' claims against him in this case arose prior to July 1, 1990. Moreover, the fact that the procedural requirements have changed slightly since the commencement of this action has no bearing here. At the time these plaintiffs were involved in the administrative proceeding, the Commissioner was the statutorily designated state review officer; thus he is not entitled to summary judgment simply because he no longer is designated as such.

### D. Proper Party

■ As with his other arguments, the Commissioner makes the bald assertion, with no case support, that because he was not a party to the administrative proceeding, he is not "properly a party" to this action. Commissioner's Memorandum of Law at 3. In a subsequent letter to the court the Commissioner did cite one case, *Antkowiak by Antkowiak v. Ambach*, 838 F.2d 635 (2nd Cir. 1988), which he claims supports this proposition, but it most clearly does not.[18] As plaintiffs correctly point out, pursuant to 20 U.S.C. § 1415(e)(2), they were only entitled to bring this action because they were "aggrieved" by Commissioner's decision. So, obviously then the Commissioner is a proper party to this action, and the Commissioner's motion must be denied insofar as it is premised upon the assertion that he is not.

### II. IDEA

Before turning to the substance of plaintiffs' IDEA claims, there are several important preliminary issues which the court must address. The first is whether plaintiffs should be allowed to supplement the record as to Emily's progress and current status.

### A. Supplementing Record

■ Due in large part to the parties' intransigence, a significant amount of time has passed since the court first heard oral argu-

ment on these motions. In fact, Emily is now 13, almost 14, years old and currently in the sixth grade, whereas at the commencement of this lawsuit in August, 1989, Emily was nine years old and entering the first grade. Because of this, in August of this year, plaintiffs sought to supplement the record regarding Emily's academic status.[19] In addition, because of recent developments in this constantly evolving area of the law, the plaintiffs sought permission to file a supplemental memorandum of law. The District promptly objected to allowing the record to be supplemented, although it did not object to the filing of supplemental memoranda of law. To avoid any further delay, the court allowed the parties to file supplemental memoranda of law and to supplement the record. In so doing, however, the court advised that after having an opportunity to review the same, as well as the applicable law, it would then decide whether it would actually consider the supplemental documents in conjunction with these motions.

There being no objection to the court's consideration of the supplemental memoranda of law, that has been done. Rather the real bone of contention here is whether the plaintiffs should be allowed to supplement the record at this point in the litigation. Plaintiffs argue that under § 1415(e)(2) of the IDEA, they should be allowed to do so. The District responds that under that statute, the court should exercise its discretion and decline to allow the record to be supplemented "because the information is immaterial and irrelevant to the issues now pending before the court." Hornik Affidavit II at ¶ 2. More specifically, the District asserts that the supplemental information provided by the plaintiffs has no bearing on the issue of whether the challenged placement was "appropriate," because this information mostly pertains to what transpired during the past academic year (1992–93) and that is not at issue in this lawsuit. Furthermore, the District points out that Emily's placement during the 1992–93 academic year did not come

18. In *Antkowiak,* the Second Circuit held that the district court did not have the authority under the EHA to order the Commissioner to place a child in an unapproved private school which violated state educational standards.

19. This supplemental documentation focuses on the 1992–93 academic year—the most recent academic year which Emily has completed.

about because the District determined that it was appropriate for her; but rather, that placement came about, as had Emily's placements in the previous four years, as a result of the various "stay-put" provisions of the IDEA and the New York Education Law, in combination with interim compromises worked out between the District and the plaintiff parents.

Section 1415(e)(2), the provision of the IDEA under which plaintiffs are seeking to supplement the record, provides in relevant part:

> In any action brought under this paragraph the court shall receive the records of the administrative proceedings, **shall hear additional evidence** at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2) (West 1990) (emphasis added). There is relatively little case law construing the additional evidence clause of this statute. However, the First Circuit in *Town of Burlington v. Department of Educ.*, 736 F.2d 773 (1st Cir.1984), *aff'd on other grounds*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), did have occasion to interpret that particular clause. Finding "no legislative history to guide [it] on the construction to be given 'additional evidence,'" *id.* at 790 n. 20, the Court went on to construe the term "'additional' in the ordinary sense of the word, ..., to mean supplemental." *Id.* at 790 (citation and footnote omitted). The Court then explained:

> [t]he reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, **and evidence concerning relevant events occurring subsequent to the administrative hearing.**

*Id.* (emphasis added). Indeed, the First Circuit went so far as to recognize "that in many instances experts who have testified at the administrative hearing will be bringing the court up to date on the child's progress from the time of the hearing to the trial." *Id.* at 791.

More recently, in *Metro. Gov. of Nashville & Davidson County v. Cook*, 915 F.2d 232 (6th Cir.1990), the Sixth Circuit was faced with the issue of whether the district court erred in admitting evidence under § 1415(e)(2) relating to less restrictive alternative educational placements for the child. The Court held that the district court did not err, and in so doing expressly declined to adopt the position of the Court in *Town of Burlington*, "[i]nsofar as this language suggests that additional evidence is admissible only in limited circumstances, such as to supplement or fill in the gaps in the evidence previously introduced, ..." *Id.* at 234. Disagreeing with the First Circuit's definition of "additional," the Court offered its own view as to the meaning of that term: "'Additional,' in its ordinary usage, implies something that is added, or something that exists by way of addition. To 'add' means to join or unite; the limitation on what can be joined inherent in the term 'supplement' is not present in the term 'add.'" *Id.* Interestingly, the Sixth Circuit opined that:

> [e]ven the First Circuit [in *Town of Burlington* ] would not have found fault with the consideration of evidence of additional placements in the present case. *Town of Burlington*, leaves the determination of what additional evidence may be admitted to the trial court. In the present case, the admission of additional evidence regarding less restrictive placements does not undercut the statutory role of administrative expertise. It is appropriate for a court that has determined that a hearing officer failed to consider the statutorily least restrictive alternative requirement to consider less restrictive placements.

*Id.* at 235.

One additional case deserves comment and that is *Jean N. and Lee N. v. Tirozzi*, 17 EHLR 580 (D.Conn.1991), a case heavily relied upon by the District to support its position that the court should not permit the record to be supplemented in this case. According to the District, *Tirozzi* stands for the proposition that "[Emily's] current status, including her performance and placement during the past school year, are wholly irrelevant ... and would by inappropriate for the

Court to consider in connection with the pending motion[s]." Letter of Robert Hornik, Jr. to Court (Aug. 12, 1993) at 1. What is abundantly clear after a careful reading of *Tirozzi*, however, is that it actually supports the position of the plaintiffs and not that of the District.

In *Tirozzi*, the district court was asked to consider the testimony of four professionals " 'who ha[d] been involved with the evaluation and provision of education, psychotherapy, or speech and language services for the plaintiff's child since the conclusion of the state due process hearing." *Id.* at 581 (citation omitted). The court allowed those professionals to testify even though they had testified at the state due process hearing. The court found that "[a]lthough 'an administrative hearing witness is rebuttably presumed to be foreclosed from testifying at trial,' *Town of Burlington,* [*supra,* 736 F.2d] at 791," the plaintiffs had overcome that presumption because

> [i]t has been well over two years since the plaintiffs' and defendants completed the state due process proceedings, and the witnesses proposed by the plaintiffs will be 'bringing the court up to date' on the child's progress from the time of the hearing to the trial, a function expressly accepted by the court in *Town of Burlington*
> . . . .

*Id.* (citation omitted). Thus, the court allowed the proposed witnesses to "testify as to the condition of the plaintiffs' child subsequent to the conclusion of the state due process hearing." *Id.* (emphasis added); *see also Lenn v. Portland School Committee,* 998 F.2d 1083, 1088 (1st Cir.1993) (implying that district court properly received newly emergent documentation chronicling the child's educational progress).[20]

Regardless of how "additional evidence" is defined, the court believes that under the facts presented by this case, it is proper to allow the record to be supplemented. Supplementing the record here will, as in *Cook,*

serve to "bring the court up to date" on Emily's progress since both the due process hearing and the time when these motions were argued. Only by allowing the record to be supplemented will the court have a complete picture as to Emily's educational status. As the parties know all too well, the educational issues which must be resolved in a case such as this are far from easy, and in the court's view any relevant evidence which would assist the court in deciding these issues should be considered. And, as the parties are also aware, in prior litigation, the court has taken a similarly expansive view of the additional evidence requirement of § 1415(e)(2). *See Hiller v. Bd. of Educ. of Brunswick Cent. Sch. D.,* 687 F.Supp. 735, 739 (N.D.N.Y.1988) (McCurn, C.J.) ("[N]otwithstanding the [plaintiffs'] failure to initiate a hearing contesting the decision that David was not handicapped for the present academic year, this court, in its independent review of whether David has received an appropriate education in 1985 can hear additional evidence."). Moreover, allowing plaintiffs to supplement the record here is consistent with the Second Circuit's observation in *Briggs* that even though "the parties declined to present any additional evidence that had not been presented to the hearing officer, . . . they could have done so pursuant to 20 U.S.C. § 1415(e)(2)." *Briggs v. Bd. of Educ. of State of Conn.,* 882 F.2d 688, 691 (2nd Cir.1989).

Furthermore, after meticulously reviewing the administrative record in this case, as will be further discussed, it does not appear to the court that either the hearing officer or the Commissioner considered the least restrictive alternative placement for Emily. Thus, under the Sixth Circuit's reasoning in *Cook,* because of that omission it is entirely appropriate for this reviewing court to consider additional evidence of less restrictive placements, such as Dr. Schnorr's initial recommendation that Emily be mainstreamed for more than just nonacademic subjects.

---

**20.** Even though all three of the cases just discussed dealt with allowing additional testimony and/or evidence at the time of trial, as opposed to

allowing the same in conjunction with a summary judgment motion, they are nevertheless in-

*See* Mavis Affidavit I, exh. A thereto at 19.[21] Lastly, the court notes that consideration of this supplemental documentation in no way undermines or supplants the administrative process because that information was not before either the hearing officer or the Commissioner. By the same token, however, even though the court has decided that it is permissible to supplement the record, the court does not mean to suggest that now it will be expanding the scope of the issues raised in the initial motions. It will not.

### B. Statutory Framework

At the heart of the IDEA is the laudable purpose of "assur[ing] that all children with disabilities have available to them, . . ., a free appropriate education. . . ." 20 U.S.C. § 1400(c) (West Supp.1993). According to the IDEA, a "free appropriate public education" encompasses "special education and related services to meet the needs of children with disabilities." 20 U.S.C. § 1400(b)(7) (West Supp.1993). "An appropriate education is therefore provided when *personalized* educational services are provided." *Straube, supra*, 801 F.Supp. at 1174–75 (emphasis added) (citing *Board of Education v. Rowley by Rowley*, 458 U.S. 176, 197, 102 S.Ct. 3034, 3046, 73 L.Ed.2d 690 (1982)). Given the relatively broad statutory definition of a "free appropriate public education,"[22] however, what constitutes the same has engendered much litigation in the years since the enactment of the IDEA. But, before turning to the particular IDEA concerns raised by these motions, a discussion of the Act's statutory framework, as well as relevant case law construing that Act is in order.

The dispositive issue in this case is whether the District's proposed placement for Emily fully comports with the IDEA and, in particular, the mainstreaming requirement thereunder. Although easy to state, as will be seen, this issue is not easy to resolve.[23] To decide this troublesome issue a clear understanding of the Act's mainstreaming requirement is necessary, and the court will endeavor to provide that.

The seminal IDEA case is *Board of Education v. Rowley by Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), wherein the Supreme Court set forth a two-part

---

structive, especially given the dearth of case law interpreting this additional evidence clause.

21. Due to the inevitable changes in the curriculum as children mature, the nature and extent of the mainstreaming Dr. Schnorr proposes for Emily has changed somewhat from her original recommendation, and the court has taken that into account too.

22. The IDEA further defines "free appropriate public education" as, "special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title. 20 U.S.C. § 1401(a)(18) (West 1990).

23. *See Briggs v. Bd. of Educ. of State of Conn.*, 882 F.2d 688, 692 (2d Cir.1989) (quoting *Tucker v. Bay Shore Union Free School Dist.*, 873 F.2d 563, 565 (2d Cir.1989)) (" '[I]n application, the specific meaning of the 'free appropriate education' guaranteed by the [Act] can be a difficult issue for the courts.' "). The difficulty in deciding exactly what constitutes a "free appropriate

public education" is exacerbated where, as here, mainstreaming is the issue. The issue of mainstreaming complicates matters because of conflicting statutory provisions, as the Fifth Circuit explained in *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036 (5th Cir.1989):

> By creating a statutory preference for mainstreaming, Congress also created a tension between two provisions of the Act. School districts must both seek to mainstream handicapped children and, at the same time, must tailor each child's educational placement and program to his [or her] special needs. §§ 1412(1) and (5)(B). Regular classes, however, will not provide an education that accounts for each child's particular needs in every case. The nature or severity of some children's handicaps is such that only special education can address their needs. For these children, mainstreaming does not provide an education designed to meet their unique needs and, thus, does not provide a free appropriate public education. As a result, we cannot evaluate in the abstract whether a challenged placement meets the EHA's mainstreaming requirement. Rather, that laudable policy objective must be weighed in tandem with the Act's principal goal of ensuring that the public schools provide handicapped children with a free appropriate public education.' . . .

inquiry for claims under that Act. The first inquiry under § 1415(e)(2) of the IDEA is to determine whether the state has "complied with the procedures set forth in the Act ..." *Id.* at 206–07, 102 S.Ct. at 3051.[24] The second inquiry is whether "the individualized educational program [IEP] .. [is] reasonably calculated to enable the child to receive educational benefits[.]" *Id.* A number of Circuit Courts have acknowledged, though, that this two-part test is not particularly useful in a case such as the present one where the issue is whether the IDEA's mainstreaming requirement has been satisfied.[25] *See Oberti, supra,* 995 F.2d at 1215; *Greer v. Rome City School Dist.,* 950 F.2d 688, 695–96 (11th Cir. 1991), *revised on other grounds by,* 967 F.2d 470 (11th Cir.1992); *Daniel R.R., supra,* 874 F.2d at 1045; and *A.W. v. Northwest R–1 School District,* 813 F.2d 158, 163 n. 7 (8th Cir.), *cert. denied,* 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987). Instead of employing the *Rowley* test, the Fifth Circuit in *Daniel R.R.* adopted a different two-part test for mainstreaming cases, which requires courts to ask the following questions:

> First, we ask whether education in the regular classroom, **with the use of supplemental aids and services,** can be achieved satisfactorily for a given child. *See* § 1412(5)(B). If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

*Daniel R.R.,* 874 F.2d at 1048 (emphasis added).

*Id.* at 1044–45 (citations omitted).

**24.** At oral argument, the parties conceded that the first inquiry is not at issue because the plaintiffs are not raising any procedural challenges. Nov. 13, 1990 Transcript at 4.

**25.** The IDEA contains a specific mainstreaming requirement, providing that states must establish: procedures to assure that, to the maximum extent appropriate, children with disabilities, ... are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in

With the proviso that the factors listed therein were by no means exhaustive, the *Daniel R.R.* Court identified a number of factors which it deemed relevant to the mainstreaming issue. *See id.* First a court should consider "[w]hether the state has taken steps to accommodate the handicapped child in regular education[;]" and second it should consider, "[w]hether the child will receive an educational benefit from regular education." *Id.* at 1048–49. Further the *Daniel R.R.* Court stated that, "[w]e also must examine the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual · child[,]" and "[w]hat effect the handicapped child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving." *Id.* at 1049.

As in the present case, Daniel's parents had maintained that the school district's refusal to place him in a class of nondisabled students violated the IDEA. Utilizing the factors just enumerated, however, the Court concluded that Daniel's removal from regular education did not "[r]un afoul of the EHA's preference for mainstreaming." *Id.* at 1050. The Court reasoned that Daniel's removal did not violate the EHA because he could not be educated satisfactorily in a regular classroom. *Id.* In reaching that conclusion the Court pointed to the fact that the district had "[t]aken creative steps to provide Daniel as much access to nonhandicapped students as it can, while providing him an education that is tailored to his unique needs," resulting in mainstreaming Daniel to the "maximum extent possible." *Id.*

regular classes with the use of supplementary aids and services cannot be achieved satisfactorily,.... 20 U.S.C. § 1412(5)(B) (West Supp.1993). This mainstreaming requirement is mirrored in both the federal regulations and in the New York State Education Law. *See* 34 C.F.R. § 300.550 (1993) and N.Y.Educ.Law § 4404(4) (McKinney Supp.1993). That provision manifests Congress' strong preference in favor of including or integrating disabled children in regular classrooms. *Oberti, supra,* 995 F.2d at 1214 (and cases cited therein); *see also Lachman v. Illinois State Board of Education,* 852 F.2d 290, 295 (7th Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988).

The Court also relied upon the fact that "Daniel's needs commanded most of the Pre-kindergarten instructor's time and diverted much of her attention away from the rest of her students." *Id.* In addition, even with a modified curriculum Daniel received "few benefits" in the regular classroom. *Id.* Elaborating upon the educational benefits which Daniel received, or, more accurately, did not receive, the Court ultimately concluded that because he did not participate in class activities and because he "cannot master most or all of the lessons taught in the class[,] ... [p]re-kindergarten offers Daniel nothing but an opportunity to associate with nonhandicapped students." *Id.* Further, noting that the full day program was simply too strenuous for a child such as Daniel, and that he would sometimes fall asleep at school due to exhaustion, the Court explained that, "[r]egular education not only offers Daniel little in the way of academic or other benefits, it also may be harming him." *Id.* at 1051. Another detrimental effect of educating Daniel in a regular classroom was that "the stress of regular education may be causing [him] to develop a stutter." *Id.* Lastly, the Court found that because of the inordinate amount of time the instructor had to devote to Daniel, other, "equally deserving students" were not being fairly treated in the classroom. *Id.* Viewing all of these factors together, the Court found that Daniel could not be satisfactorily educated in a regular classroom.

Since *Daniel R.R.*, and since these motions were argued, the Third and Eleventh Circuits have expressly adopted the *Daniel R.R.* two-part inquiry for mainstreaming cases. *See Oberti*, 995 F.2d at 1215; and *Greer*, 950 F.2d at 696. Most recently, in *Oberti*, the Third Circuit opined, "[w]e think this two-part [*Daniel R.R.* ] test, which closely tracks the language of § 1412(5)(B), is faithful to IDEA's directive that children with disabilities be educated with nondisabled children 'to the maximum extent appropriate,' 20 U.S.C.

§ 1412(5)(B), and to the Act's requirement that schools provide individualized programs to account for each child's specific needs, 20 U.S.C. §§ 1401, 1414(a)(5)." *Oberti*, 995 F.2d at 1215 (other citations omitted). The Court in *Oberti* also expressly rejected the earlier interpretation of IDEA's mainstreaming requirement offered by the Sixth Circuit in *Roncker v. Walter*, 700 F.2d 1058 (6th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983),[26] explaining that

the two-part *Daniel R.R.* test is the better standard because the *Roncker* test fails to make clear that even if placement in the regular classroom cannot be achieved satisfactorily for the major portion of a particular child's education program, the school is still required to include that child in school programs with nondisabled children (specific academic classes, other classes such as music and art, lunch, recess, etc.) whenever possible.

*Id.*

Application of the *Daniel R.R.* test in *Oberti* resulted in the Court affirming the district court's finding that the school district violated the IDEA's presumption in favor of mainstreaming, when it placed a Down's Syndrome child in a separate education program outside the school district. In reaching that conclusion, the Circuit Court first examined whether the district court's finding that the school district had taken no meaningful steps to try to include the child in a regular classroom with supplementary aids and services was clearly erroneous. *Oberti*, 995 F.2d at 1221. The Court held that it was not because over the course of two academic years the district had made only "negligible efforts" to include the child in a regular classroom. *Id.* at 1220. To illustrate, during one academic year "the only period during which the School District mainstreamed Rafael in a regular classroom, the School District placed Rafael in the developmental kindergarten class 'without a curriculum plan, without a behavior management plan, and without pro-

**26.** The *Roncker* Court, the first Circuit Court to interpret the IDEA's mainstreaming requirement, held:

In a case where the segregated facility is considered superior [academically], the court should determine whether the services which

make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act.

700 F.2d at 1063; *see also Northwest R–1 School Dist.*, 813 F.2d at 163 (adopting *Roncker* test).

viding adequate special education support to the teacher.'" *Id.* at 1220 (quoting *Oberti v. Board of Educ. of Clementon School Dist.*, ("*Oberti II*") 801 F.Supp. 1392, 1402 (D.N.J. 1992)) (other citation omitted). The following academic year the Court found that the child "was placed in a segregated class with 'no meaningful mainstreaming opportunities,' ..., and that '[t]he School District's consideration of less restrictive alternatives for the 1990–91 school year was perfunctory.'" *Id.* at 1221 (quoting *Oberti II*, 801 F.Supp. at 1396 and 1397). What is more, the record in *Oberti* demonstrated that "the School District had access to information and expertise about specific methods and services to enable children with disabilities like Rafael to be included in a regular classroom, ..., but that the School District did not provide such supplementary aids and services for Rafael in the kindergarten class." *Id.* (citation and footnote omitted).

With respect to the second factor analyzed by the Third Circuit—a comparison of the educational benefits of a segregated placement versus placement in a regular classroom—the Court deferred to the lower court's findings that not only would the child "benefit academically and socially from inclusion in a regular classroom," but that "'nondisabled children class will likewise benefit' from the inclusion of Rafael in a regular classroom." *Id.* at 1221–22 (quoting *Oberti II*, 801 F.Supp. at 1404) (other citation omitted). As to the third and final factor evaluated by the *Oberti* Court—the potentially disruptive effect of Rafael's presence on other children in the regular classroom—the Court held that the lower court's finding that "the behavioral problems Rafael experienced during the 1989–90 school year in the developmental kindergarten class 'were exacerbated and remained uncontained due to the inadequate level of services provided there,' that Rafael's behavioral problems were diminished in settings where an adequate level of supplementary aids and services were provided, and that both the School District and the ALJ 'improperly justified Rafael's exclusion from less restrictive placements in subsequent years based upon those behavior problems.'" *Id.* at 1222–23 (quoting *Oberti II*, 801 F.Supp. at 1403). Because the Circuit Court affirmed the lower court's determination that the school district had violated the IDEA's mainstreaming requirement, the Court did not go on to apply the second part of the *Daniel R.R.* test—that is whether the child had been included in programs with nondisabled children whenever possible. *Id.* at 1223.

Likewise, in *Greer* the Eleventh Circuit followed the Fifth Circuit's lead in *Daniel R.R.* and applied that two-part mainstreaming test to determine whether a ten year old child with Down's Syndrome was being educated in the "least restrictive environment." The district court found that she was not and on appeal the Circuit Court agreed. As in *Oberti*, applying the *Daniel R.R.* test the Court found that it need not reach the second part of that test because the school district failed to meet the first part of the test. In other words, the *Greer* Court found that the school district did not show whether education in a regular class could be satisfactorily achieved with the use of supplemental aids and services because, among other reasons, "prior to and during" the development of the child's IEP, it did not consider a full range of supplemental aids and services, such as "resource rooms and itinerant instruction,...." *Id.* at 698. The Court also faulted the school district for not making any effort to modify the kindergarten curriculum to accommodate the child in a regular classroom. *Id.* Finally, the Court reasoned that, "the school district's determination that [the child] would receive more benefit from education in a self-contained special education classroom than in a regular classroom is due no deference because school officials failed to consider what benefit she would receive from education in a regular classroom *with appropriate supplemental aids and services.*" *Id.* (emphasis in original).

■ As just discussed, *Greer* and *Oberti* are instructive from a substantive viewpoint, but they also provide guidance on two significant procedural issues here. The first is which party bears the burden of proof with respect to the IDEA's mainstreaming re-

quirement.[27] As the Third Circuit accurately observed in *Oberti,* "neither *Rowley* nor the Act itself specifically addresses which party bears the burden of proof at the district court level,...." 995 F.2d at 1218. Despite the lack of guidance from either of those two sources, the *Oberti* Court plainly held that when the IDEA's mainstreaming requirement is at issue, "it is appropriate to place the burden of proving compliance with IDEA on the school." *Id.* at 1219. In so holding, the Third Circuit soundly reasoned that: "[t]he Act's strong presumption in favor of mainstreaming, 20 U.S.C. § 1422(5)(B), would be turned on its head if parents had to prove that their child was worthy of being included, rather than the school district having to justify a decision to exclude the child from the regular classroom." *Id.* at 1219. The Court also set forth a few "practical considerations" to support its finding that the school district should bear the burden of proof when mainstreaming is at issue:

> Requiring parents to prove at the district court level that the school has failed to comply with the Act would undermine the Act's express purpose 'to assure that the rights of children with disabilities and their parents are protected,' 20 U.S.C. § 1400(c), and would diminish the effect of the provision that enables parents and guardians to obtain judicial enforcement of the Act's substantive and procedural requirements,.... In practical terms, the school has an advantage when a dispute arises under the Act.: the school has better access to the relevant information, greater control over the potentially more persuasive witnesses (those who have been directly involved with the child's education), and greater overall educational expertise than the parents....

*Id.* at 1219 (citations omitted).[28]

This court fully agrees with the Third Circuit's analysis and conclusion in *Oberti.*

Therefore, the burden of proving compliance with the IDEA's mainstreaming requirement here is on the District. The court is fully cognizant of the Second Circuit's comment in *Briggs* that "[n]either the court nor the Briggs pointed out anything in the administrative record to substantiate the claim that James' needs could be met in a less segregated setting." *Briggs,* 882 F.2d at 692. As did the Third Circuit, however, this court does not find *Briggs* to be persuasive authority on the issue of which party bears the burden of proof when the IDEA's mainstreaming requirement is at issue. Clearly that issue was not before the Court in *Briggs.* Rather, the primary focus of the Court's inquiry in *Briggs* was whether the district court gave sufficient deference to the agency experts and hearing officer; and the Court found that it did not. *Id.* at 693. As previously mentioned, the issue of which party bears the burden of proof on the mainstreaming issue at the district court level "is quite different from the district court's obligation to afford due weight to the administrative proceedings." *Oberti,* 995 F.2d at 1218. Consequently, in this case the burden is on the District to show that Emily's proposed placement, which would segregate her for subjects which are traditionally deemed to be more academic in nature (such as math, science and social studies), comports with the IDEA's statutory presumption in favor of mainstreaming.

The Eleventh Circuit's decision in *Greer* also has some relevance to this case from a procedural standpoint. In *Greer* the Court had occasion to address at what point in the process a school district must consider whether education in the regular classroom may be achieved satisfactorily with supplemental aids and services.[29] As previously mentioned, the Court unequivocally held that

27. Although the parties did not explicitly address this issue, given recent case law development, and the obvious significance of such issue, the court will do so.

28. To date, there is one available decision of which this court is aware where a district court followed the approach taken by the Court in *Oberti. See Delaware County, supra,* 831 F.Supp. at 1214. In fact, the court there went one step

further and held not only that the school district had the burden of proof on the mainstreaming issue, but that it also bore the burden of proof on the other issues as well. *Id.*

29. Again, although this is not an issue expressly raised by the parties, because of recent case law development and its obvious importance to this court's analysis, the court will address it.

a school district must make that assessment *"prior to and during* the development of the IEP." 950 F.2d at 696 (emphasis in original). "It is not sufficient that school officials determine what they believe to be the appropriate placement for a handicapped child and then attempt to justify this placement only after the proposed IEP is challenged by the child's parents." *Id.* In more terse language, the Court later stated, "[w]e will not consider after-the-fact justifications for a predetermined placement." *Id.* at 698. After carefully reviewing the record, the Court found that "the school district, during the development of the IEP, did not take steps to accommodate Christy in the regular classroom[,]" because, *inter alia*, they "failed to consider the **full** range of supplemental aids and services, including resource rooms and itinerant instruction, that could be provided to assist Christy in the regular classroom." *Id.* (emphasis added). Thus after *Greer*, in the present case it is incumbent upon the District to show that prior to and during the development of the challenged IEP, it considered the "full range of supplemental aids and services" that could be provided to assist Emily in a regular classroom. *See id.*

## C. IDEA Compliance

### 1. Standard of Review

 In analyzing the thorny issue of whether the CSE's recommended placement, which the plaintiffs are challenging, is in full compliance with the IDEA, the court is mindful of its fairly circumscribed role in this proceeding. The IDEA, as interpreted by the Supreme Court in *Rowley*, mandates that

**"due weight** shall be given to these [administrative] proceedings." 458 U.S. at 206, 102 S.Ct. at 3051 (emphasis added). In this regard, as this Court has previously observed, "[a] number of other courts, including the Second Circuit, have held that the administrative findings in lawsuits brought under the [IDEA] should be accorded **some** degree of deference." *Hiller v. Bd. of Ed. of Brunswick Cent. Sch. D.,* 743 F.Supp. 958, 968 (N.D.N.Y.1990) (McCurn, C.J.) (emphasis added). However, exactly what constitutes "due weight" as envisioned by the *Rowley* Court remains an open issue in this Circuit,[30] as well as in others.[31]

For example, fairly recently in *Fuhrmann,* Judge Hutchinson dissenting suggested that the Third Circuit follow the due weight standard articulated by the First Circuit in *Town of Burlington.* 993 F.2d at 1042. In *Burlington* the First Circuit "concluded that the weight due the administrative decision is best left to the discretion of the district court[.]" *Id.* As Judge Hutchinson pointed out, the First Circuit did offer some guidance to lower courts as to how that discretion should be exercised:

The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. Af-

---

30. The Second Circuit in *Karl v. Board of Educ. of Geneseo C. School Dist.,* 736 F.2d 873 (2d Cir.1984), did opine that "[w]e believe *Rowley* requires that federal courts defer to the final decision of the state authorities, and that deference may not be eschewed merely because a decision is not unanimous or the reviewing authority disagrees with the hearing officer. *Id.* at 877. However, neither in *Karl* nor since has the Second Circuit expressly decided the amount of deference agency findings should be accorded under the *Rowley* due weight standard.

31. *See Delaware County, supra,* 831 F.Supp. at 1213 (citing *Fuhrmann v. East Hanover Board of Education,* 993 F.2d 1031, 1043 (3d Cir.1993) (Hutchinson, J., dissenting).

The court does note, however, that in *Thornock v. Boise Independent School Dist. No. 1,* 1984–85 EHLR DEC.556:477 (4th Dist.Idaho 1985), the court explained the *Rowley* due weight standard as follows:

*Rowley* required that due weight be given to the proceedings before the hearing officer, **not** to the subsequent decision by the hearing officer. This would indicate that the evidence presented in the hearing be considered as much a part of the record as any proceedings before the Court as long as those proceedings comply with 29 U.S.C. § 1415. It *does* **not** imply that the hearing officer's findings and conclusions should rise beyond whatever persuasive value they have in the Court's decision on the merits.

*Id.* at 556:480 (emphasis added).

ter such consideration, the court is free to accept or reject the findings in part or in whole.

*Id.* (quoting *Burlington*, 736 F.2d at 792). Relying upon the foregoing, Judge Hutchinson "further defined this standard by saying 'if the evidence fairly and rationally supports the agency's findings, and those findings are not cast into doubt by other evidence the agency did not have before it, the district court is justified in deferring to the state education authorities' expertise in deciding what educational program is appropriate for an individual child.'" *Delaware County*, 831 F.Supp. at 1214 (quoting *Fuhrmann*, 993 F.2d at 1043) (other citations omitted). Although the majority in *Fuhrmann* did not comment upon Judge Hutchinson's proposed definition of "due weight," the district court in *Delaware County* applied that standard in the absence of any further guidance from the Third Circuit. *Id.*

 So too will this court. As noted earlier, Second Circuit case law discussing the concept of due weight first enunciated in *Rowley* is not particularly enlightening. Thus, because both the First Circuit and the Third Circuit, the latter albeit in a dissent, provides some helpful guidance on this issue, and because the court finds their reasoning sound, it has reviewed the administrative record in this case with those concepts of due weight in mind.

### 2. Application of Daniel R.R. Test [32]

In the present case, the parties agree that the court should employ the *Daniel R.R.* two-part test for determining compliance with the IDEA's mainstreaming requirement. The parties offer widely differing views, however, as to the result application of that test yields. Under *Daniel R.R.*, the court must first explore whether "in [a] regular classroom, with the use of supplemental aids and services," Emily can satisfactorily achieve an education. Essentially plaintiffs maintain that she can, but that she has not been give the opportunity to do so because she has not been provided with sufficient supplemental aids and services. On the other hand, the District maintains that the record clearly demonstrates that Emily cannot

---

**32.** Whether the District's IEP provided Emily with a "free appropriate public education" is a mixed question of law and fact. *JSK By and Through JK v. Hendry County School Bd.*, 941 F.2d 1563, 1571 (11th Cir.1991) (and cases cited therein); *see also W.G. v. Bd. of Trustees of Target Range School D.*, 960 F.2d 1479, 1483 (9th Cir. 1992) (same). In *Bertolucci v. San Carlos Elementary School Dist.*, 721 F.Supp. 1150 (N.D.Cal.1989), the court explained that the hesitancy by courts to grant summary judgment on mixed questions of law and fact is due to the fact that ordinarily the record has not been sufficiently developed to allow a fully informed decision on the outcome of a determinative issue. *Id.* at 1153 (*citing* W. Schwarzer, *Summary Judgment under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 475 (1983)). But, as the court also recognized in *Bertolucci*, cases such as the present one which are brought pursuant to 20 U.S.C. § 1415(e) "[a]re unusual in that an ample administrative record is placed before the district court for review." *Id.* Therefore, the concern over whether the record has been sufficiently developed is generally not present in these cases. *Id.* Thus, summary judgment is proper even in the context of the IDEA. *Norton School Com. v. Massachusetts Dept. of Educ.*, 768 F.Supp. 900, 904 (D.Mass.1991) (and cases cited therein).

Based upon the foregoing, clearly the summary judgment procedure may be properly employed in the present case. Before the court on these motions are the voluminous hearing transcript with accompanying exhibits, as well as both of the hearing officer's decisions and the Commissioner's decision. In addition, as previously discussed, the record has been supplemented with additional evidence to fully apprise the court as to Emily's placements over the years and her current educational status. Thus, there is no doubt that this record has been sufficiently developed to allow the court to decide the issues presently before it on these summary judgment motions.

Indeed, this case is in a nearly identical posture to *Bertolucci*, where the court stated:

[s]ummary judgment is appropriate because there are no historical facts in dispute that relate to whether the district's program is appropriate for Angelo, and the resolution of this ultimate fact does not turn on an assessment of witness credibility or demeanor.... Although differences do exist between the experts, the differences concern judgments, opinions, and conclusions, and do not implicate credibility or demeanor. A trial is therefore unnecessary and summary judgment is therefore appropriate in this case....

*Id.* (citations omitted). Thus, as in *Bertolucci*, because the only real dispute is between the experts regarding the appropriateness of Emily's IEP, this court can decide these summary judgment motions and need not conduct a trial.

be satisfactorily educated in a regular classroom setting.

### a. Standard of Progress

At the outset the court must decide what constitutes "satisfactory" educational progress for Emily. In so doing, the court in no way intends to supplant the experts' views as to Emily's potential for academic progress. However, it became apparent at oral argument and again in rereading the transcripts from the administrative hearing, as well as the parties several memoranda of law, that although the parties agree that Emily cannot make satisfactory educational progress with the regular curriculum,[33] they disagree as to the standard against which her educational progress should be measured. Plaintiffs contend that Emily's progress should **not** be measured in terms of a nondisabled child, which is the standard the District seems to suggest. Instead, plaintiffs believe that Emily's educational progress should be measured in terms of her own abilities; and this view finds support in both the case law and in the IDEA itself.

To illustrate, in *Thornock, supra,* in discussing the standard to be used when assessing educational benefits to a disabled student, the court stated:

> Given the fact that the IEP process is designed in part to define satisfactory education for each child on an individual basis and that this process is part of the statutory scheme, we cannot conclude that Congress intended mainstreaming to be restricted to those who could progress from grade to grade in the normal academic program. Rather, the ability of the child to be mainstreamed successfully will depend on the goals of the IEP and the child's achievement of those goals.

*Id.* at 556:482. Indeed, the *Thornock* court went so far as to hold that "absent evidence that the child cannot meet the academic requirements of **his** [or her] **IEP** in a mainstreamed environment, any non-mainstreamed placement is legally insufficient and cannot possibly constitute a free appro-

priate public education." *Id.* (emphasis added).

As plaintiffs correctly point out, the New York State Education Department has taken a similar approach. In *Board of Educ. Schalmont Central School Dist.,* No. 90–19 (Dec. 11, 1991), the State Review Officer expressly held that "[i]n determining whether a pupil's education can be provided in a regular education setting, it is not necessary to demonstrate that a pupil with a handicapping condition will learn at approximately the same level as his or her non-handicapped peers...." *Id.* (citation omitted). The Review Officer in *Schalmont* went on to explain, "[t]he relevant inquiry is whether a pupil with a handicapping condition can achieve the goal of his or her IEP within a regular education program, *with the assistance of appropriate supplementary aids and services,* because the IEP determines what is an appropriate education program for the pupil." *Id.* (emphasis added).

These decisions are fully consistent with *Daniel R.R.* where the Fifth Circuit rejected the district court's view that as a prerequisite to mainstreaming, disabled children must learn at approximately the same level as their nondisabled classmates. *See Daniel R.R.,* 874 F.2d at 1046. The Fifth Circuit declined to accept that premise because the lower court "fail[ed] to take into account the principles that the Supreme Court announced in *Rowley*[;]" in particular, the Court explained:

> States must tolerate educational differences; they need not perform the impossible: erase those differences by taking steps to equalize educational opportunities. As a result, the Act accepts the notion that handicapped students will participate in regular education but that some of them will not benefit as much as nonhandicapped students will. The Act requires states to tolerate a wide range of educational abilities in their schools and, specifically, in regular education—the EHA's preferred educational environment. Given the tolerance embodied in the EHA, we cannot predicate access to regular edu-

---

**33.** *See, e.g.,* Hearing Transcript Nov. 28, 1989 at 127 (Emily not capable of handling first grade curriculum); and Hearing Transcript Aug. 16, 1988 at 253 (plaintiff mother testified the same).

cation on a child's ability to perform on par with nonhandicapped children.

We recognize that some handicapped children may not be able to master as much of the regular education curriculum as their nonhandicapped classmates. This does not mean, however, that those handicapped children are not receiving any benefit from regular education. Nor does it mean that they are not receiving all of the benefit that their handicapping condition will permit. If the child's individual needs make mainstreaming appropriate, we cannot deny the child access to regular education simply because his educational achievement lags behind that of his classmates.

*Id.* at 1047 (footnote omitted). In light of the foregoing, in assessing whether Emily can make satisfactory progress in a regular classroom with supplemental aids and services, such progress must be measured in terms of her abilities as a disabled child. When measuring her educational achievement, Emily should not be compared to a nondisabled child; and in fact to do so would be in direct contravention of the Act, as the *Daniel R.R.* Court so cogently observed.

### b. Supplemental Aids and Services

██ Having decided the numerous important but somewhat ancillary issues raised herein, at last the court is free to discuss the crux of this lawsuit—whether the District provided Emily with a "free appropriate public education" as required under the IDEA. To decide that issue, under *Daniel R.R.* and its progeny the court will first examine whether "education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily [for Emily]." *See Daniel R.R.,* 874 F.2d at 1048. After carefully scrutinizing the entire record, including the hearing transcripts, the court finds that it is impossible to resolve this narrow issue on the present record because Emily was never provided with supplemental aids and services contemplated under the IDEA. Put simply, the District has not given Emily the opportunity to prove that she can be successful in a regular classroom. As in *Oberti* and *Greer,* the District did not provide adequate special education services

to either Emily's teacher or her aid in the 1987–88 academic year. Without such training, plainly Emily's teacher and half-time aide were not in a position to modify the regular curriculum; nor, due to a lack of training, were they able to insure that Emily was properly integrated into the regular classroom setting. Fox example, they were never provided with any type of behavior management plan or training in that regard.

Furthermore, even though Emily's subsequent placements are not directly at issue in this litigation, through the years Emily's other teachers have uniformly expressed frustration over the lack of special education training and/or services to assist them with Emily's special educational needs. When the entire record is closely scrutinized, the court is left with the distinct impression that, as in *Oberti,* the District did not take meaningful steps to include Emily in a regular classroom with adequate supplementary aids and services. "The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad." *Daniel R.R.,* 874 F.2d at 1048 (citing, *inter alia,* 34 C.F.R. Part 300, App. C Question 48) (other citation omitted). Yet, that appears to be what happened here.

Conspicuously absent from the record is any mention that the District, at any point in the process, considered less restrictive alternative placements for Emily. It appears to the court that initially the District made a unilateral decision, without considering viable alternatives, to move Emily from a regular classroom to an Option II (later changed to Option I) classroom which, by any standard, is far more restrictive than a regular classroom setting. In addition to the model offered by Dr. Schnorr, the court notes that the Commissioner's own regulations provide for other additional services which the District could have considered (and perhaps eventually offered) in making Emily's placement recommendation, such as indirect and/or direct consultant teacher assistance as well as resource rooms. *See* 8 N.Y.C.R.R. § 200.6. None of these alternatives were contemplated by the District in developing and implementing the challenged IEP, how-

ever. Additionally, also as in both *Oberti* and *Greer*, neither the hearing officer nor the Commissioner "consider[ed] whether the School District had made efforts to include [Emily] in a regular classroom with supplementary aids and services, as is required by IDEA." *See Oberti*, 995 F.2d at 1221. It is true that the facts of *Oberti* are more egregious than those presented herein in that not only was that child removed from his neighborhood school, but he was removed from the district altogether. Nonetheless, although the District here did take slightly more action than the perfunctory action noted by the *Oberti* Court, at the end of the day, the District gave only lip service to the IDEA's mainstreaming requirement; and that is not sufficient.

### c. Educational Benefits

When comparing educational benefits, at first glance the court is inclined to defer to the view held by the District and implicitly adopted by the hearing officer and the Commissioner, which is that one-on-one and small group instruction are preferable for Emily. However, this directly contradicts the view expressed by plaintiffs' witnesses that large group instruction is desirable for Emily because she can, among other things, develop appropriate modeling behavior. The difficulty arises though not from the conflicting views as to what is an optimal learning environment for Emily,[34] but rather from the fact that, as just discussed, the District failed to consider whether Emily could be satisfactorily educated in a regular classroom with appropriate supplemental aids and services.

Because the District did not make that determination, the District's conclusion, apparently adopted by the hearing officer and the Commissioner, that Emily would receive more educational benefit in an Option I placement is due no deference. *See Oberti*, 995 F.2d at 1221 (citing *Greer*, 950 F.2d at 698 ("school district's determination that child with Down's syndrome would receive more benefit in a segregated special education class 'is due no deference because

school officials failed to consider what benefits she would receive from education in a regular classroom *with appropriate supplemental aids and services.'*")) (emphasis in original). In addition, there is ample proof in the record that placement in a regular classroom is beneficial to Emily in terms of her social development; and as the Fifth Circuit realized, "[a]cademic achievement is not the only purpose of mainstreaming. Integrating a handicapped child into a nonhandicapped environment may be beneficial in and of itself." *Daniel R.R.*, 874 F.2d at 1049.

Finally, regardless of whether the District follows Dr. Schnorr's proposed model, or whether it develops some other model (as it is free to do so long as that model complies with the IDEA), obviously modification of the regular curriculum will be needed to accommodate Emily. It is important to recognize, however, as did the *Oberti* Court, that the need for modification is "'not a legitimate basis upon which to justify excluding a child' from the regular classroom unless the education of other students is significantly impaired." *Oberti*, 995 F.2d at 1222 (quoting *Oberti II*, 801 F.Supp. at 1403) (other citation omitted). The record is completely void in this case of any such showing. Thus, the court cannot accept, on this record, the District's view that placement of Emily in a primarily segregated setting complies with the IDEA.

### d. Effect of Mainstreaming

As to the third *Daniel R.R.* factor—the potentially disruptive effect of Emily's presence on other children in the regular classroom—this factor too weighs in plaintiffs' favor. At oral argument, counsel for both the District and plaintiffs conceded that there was nothing in the administrative record as then constituted showing that Emily was disruptive to other students in the regular classroom. Transcript at 29. The supplemental documentation recently provided by the District does, however, contain contrary statements. The most potentially damaging statement on this issue is that of the

---

**34.** Indeed, if that were the only issue the court would be required under *Rowley* to defer to the hearing officer and the Commissioner because

the court must avoid substituting its own educational judgment for that of administrative bodies. *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

District's attorney where he avers; that "[s]ome of the types of behavior exhibited by Emily, such as striking students and jabbing students with sharp pencils, has placed other students at risk." Hornik Affidavit II at ¶ 17. Without intending in any way to cast doubt on the veracity of Mr. Hornik, the court is concerned, from a procedural standpoint, about the manner in which this statement was presented to the court. In that affidavit Mr. Hornik does not affirmatively state that he had occasion to observe Emily during the school day when she purportedly engaged in this type of behavior. Therefore, the court can only assume that this statement was (1) not based upon personal knowledge as Rule 56(e) requires and (2) that it is hearsay, also prohibited by that Rule.[35] Thus, the court is not willing to give Mr. Hornik's assessment of Emily's supposed behavior problems much, if any, credence.[36]

Interestingly, Mr. Platz, one of Emily's teachers last year who **did** have numerous occasions to observe her first-hand did not make similar averments in his affidavit. Rather, he made relatively innocuous references to Emily's "behavioral problems" and to her episodes of "acting out." Platz Affidavit at ¶¶ 12–13. While the court appreciates the discretion exercised by Mr. Platz in this regard, in terms of weighing the potentially disruptive effect Emily might have on other children, those comments are not particularly enlightening.

When all is said and done, however, based upon the record before it, the court believes that even assuming that Emily has developed behavior problems in recent years, which could be potentially disruptive to the other children, because the District did not provide (much less consider providing) adequate supplemental services and aides, it is impossible to accurately determine the effect Emily's presence would have on the education of other children in a regular classroom. It may well be that with adequate supplemental aids and services Emily would be less frustrated in a regular classroom than she seems to have been recently; and, hence, in Mr. Platz's words she would "act out" less. In any event, the court would only be speculating to reach that conclusion now. The point is that at least at the moment there is nothing in the record to suggest that Emily " 'would present similar behavior problems if provided with an adequate level of supplementary aids and related services within the matrix of a regular education class.' " See Oberti, 995 F.2d at 1222 (quoting Oberti II, 801 F.Supp. at 1403). Thus, the District cannot rely on Emily's asserted behavioral difficulties as justification for removing her from a regular classroom, especially when those difficulties did not arise until well **after** the development of the challenged IEP.

Taking into account all of the foregoing,[37] the court finds that the first part of Daniel R.R. test has not been satisfied here. Put simply, there has been no showing that Emily cannot meet her IEP goals and objectives **with the use of supplemental aids and services**, in a regular classroom.[38] Thus the court hereby declares that the challenged IEP runs afoul of the IDEA's mainstreaming requirement. The District did not meet its

---

35. That Rule provides, in relevant part:
 Supporting and opposing affidavits **shall** be made on personal knowledge, **shall** set forth such facts as would be admissible in evidence, and **shall** show affirmatively that the affiant is competent to testify to the matters stated therein.
 Fed.R.Civ.P. 56(e) (emphasis added).

36. The court is aware, however, that although Dr. Schnorr did not observe this type of behavior herself, the same was reported to her when she observed Emily at school during the spring of last year. Mavis Affidavit II, exh. H thereto (updated Schnorr report) at 6.

37. "The Sixth Circuit has concluded that, in a limited fashion, cost is a relevant factor in determining compliance with the mainstreaming re-

quirement." Daniel R.R., 874 F.2d at 1049 n. 9 (citing Roncker, 700 F.2d at 1063) (citing, in turn, Age v. Bullitt County Schools, 673 F.2d 141, 145 (6th Cir.1982)). However, because cost was never raised as a factor by the parties, the court need not consider that issue either. See id.

38. The court notes in passing that from February, 1988 through June, 1988, Emily met slightly more than half of her Phase II IEP goals; and at that point she was not receiving supplemental services and aids such as the Act requires because, for one thing, neither her teacher nor her aid at the time were trained in special education. Hearing Transcript (Aug. 16, 1988) at 69 and 223.

burden on these motions of showing compliance with the Act; that is, the District has not justified, to the satisfaction of this reviewing court, its decision to exclude Emily from a regular classroom and place her in an Option I classroom. Because the court has answered the first part of the *Daniel R.R.* inquiry in the negative, it need not address the second part of that test. *See Daniel R.R.*, 874 F.2d at 1050.

#### e. *Relief*

In light of the foregoing, this matter is remanded to the District's Committee on Special Education with instructions to develop an Individualized Education Program for Emily Mavis which will address her particular needs and which is fully consistent with the IDEA's mainstreaming requirement. In so doing, the court refers the parties to *Oberti II* where the court so eloquently explained, in words which could have been written with Emily's situation in mind:

> Although we leave decisions as to educational methodology in the hands of the School District, to be developed in cooperation with Rafael's parents, the School District is not free at this time to recommend a self-contained special education placement for Rafael. It is now time for the School District to reconsider its position on inclusion for Rafael, and to avail itself of the resources that have enabled school districts around the country and within New Jersey successfully to educate children with moderate to severe disabilities within the matrices of regular education classes.
>
> Both the IDEA and section 504 of the Rehabilitation Act seek to address the problems created by the segregation of individuals with disabilities and compel the type of integration which we are enforcing in this case. While this surely requires readjustment and considerable effort on the part of educators, and on the part of the community in general, it is a small price to pay to increase the opportunity of individuals with disabilities to become fully-functioning, productive, and co-equal members of society, and of individuals without disabilities to learn to live in a world where individuals with disabilities

are so included. Accordingly, this is the price which we require of the School District today.

*Oberti II*, 801 F.Supp. at 1407, *aff'd*, 995 F.2d 1204 (3rd Cir.1993).

Finally, the court reminds all parties that as they set about this task, they should remember a fact which sadly seems to have been forgotten and that is that the welfare of a child is at stake. Therefore, this IEP must be developed and implemented as soon as is practicable. While engaging in this process, one aspect of the IDEA should not be overlooked and that is that its guarantee[s] are limited to providing a disabled child with an education that is "appropriate," and "not one that provides everything that might be thought desirable by 'loving parents.'" *Tucker v. Bay Shore Union Free School Dist.*, 873 F.2d 563, 567 (2d Cir.1989). Likewise, while in an ideal world Emily should be placed in a potentially maximizing situation, perhaps similar to the model advocated by Dr. Schnorr, the Act does not go so far as to require that. Rather all that the Act requires, and hence all the District must do, is to insure that Emily is educated in the "least restrictive environment" for her. It will be up to the District, working in conjunction with Emily's parents, to develop and implement an IEP which fulfills that statutory mandate.

#### III. *Rehabilitation Act*

Although originally plaintiffs also sought relief for Emily under section 504 of the Rehabilitation Act, at oral argument they withdrew that claim, and thus obviously there is no need for the court to consider such a claim now. *See* Transcript at 34.

#### IV. *Attorneys' Fees*

Given the court's rulings herein, plaintiffs qualify as "prevailing parties" for purposes of recovering their attorneys' fees under 20 U.S.C. § 1415(e)(4)(B). Therefore, plaintiffs have fifteen days from the date of entry of this order in which to file and serve the necessary documentation to support their application for attorneys' fees. Defendants have ten days to file and serve their response, if any. In the absence of such a

filing by the defendants, the court will deem defendants to have acquiesced in all respects to plaintiffs' application for attorneys' fees.

## CONCLUSION

For all of the reasons set forth above, the cross-motion for summary judgment by plaintiffs Gary and Ruth Mavis is hereby granted. The motions for summary judgment by the defendants, Thomas Sobol, as Commissioner of Education of the State of New York and the Board of Education, South Lewis Central School District are hereby denied. The parties are directed to address the outstanding attorneys' fees issue in accordance with this decision.

IT IS SO ORDERED.