Charles "Spike" GIRTY, a Minor, who sues through his parents, Charles and Vicky GIRTY, on their own behalf, Plaintiffs,

v.

**SCHOOL DISTRICT OF VALLEY GROVE, Defendant.**

No. CIV. A. 00–249 Erie.

United States District Court, W.D. Pennsylvania.

Sept. 17, 2001.

Lilian A. Akin, Pittsburgh, PA, for Plaintiffs.

Patricia K. Smith, Knox, McLaughlin, Gornall & Sennett, Erie, PA, for Defendant.

**MEMORANDUM OPINION**

McLAUGHLIN, District Judge.

The School District of Valley Grove ("the District") has proposed changing the educational placement of Plaintiff Charles ("Spike") Girty, a mentally retarded student, from full-time regular education to part-time life skills support. If imple-

mented, this placement would require Spike to attend life skills support classes for academic subjects and regular education for nonacademic subjects and to be moved to a school in another district. Pursuant to 20 U.S.C. § 1415(e), we are asked to review the determination by the Special Education Appeals Panel ("Appeals Panel") that the District's proposal complies with the "mainstreaming" requirement of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1412(5)(B).[1] Both parties have filed motions for summary judgment. For the reasons that follow, we will grant the Plaintiffs' motion [Doc. No. 7] and deny the Defendant's motion. [Doc. No. 9].

## I. BACKGROUND

Spike Girty is a fourteen-year-old boy with mental retardation. Test scores indicate that his Stanford–Benet intelligence score composite (IQ) is approximately 36, which is in the severe to moderate range of mental retardation. Plaintiff's Brief in Support of Motion for Summary Judgment at 1; Hearing Officer Decision, Administrative Record ("AR") at 61. Tests also indicate that his achievement level in all areas is commensurate with his intelligence level. Defendant's Motion for Summary Judgment at 8. Due to his handicap, he has received special education services since kindergarten. In the 1997–1998 school year, while he was in fourth grade, Spike was placed in full-time regular education with a child-specific aide. Plaintiff's Brief at 2; Hearing Officer Decision, AR at 61. Spike has continued in this placement to the present. On December 2, 1999, while Spike was in sixth grade, the District proposed changing his placement from full-time regular education to part-time life skills support. *Id.* This change would require Spike to be removed from his current school and to attend a school in an outside district. *Id.*

Spike's parents objected to the recommendation and a hearing was held on May 8 and 9, 2000. The hearing officer received testimony from various school employees, including Martin Aylesworth, the school psychologist and coordinator of special education, Susan First and Linda Bixler, sixth grade teachers who had Spike in their classes, Jeffrey Clark, the school principal, and Marilyn Frank, Spike's child-specific aide. The officer also heard testimony from two employees of the Intermediate Unit, Timothy P. Tantlinger, a life skills support teacher, and Marilyn Snyder, an instructional advisor.[2] Finally,

---

**1.** In relevant part, 20 U.S.C. § 1412(5) provides:

Least restrictive environment. (A) In general. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.
(B) Additional requirement. (i) In general. If the State uses a funding mechanism by

which the State distributes State funds on the basis of the type of setting in which a child is served, the funding mechanism does not result in placements that violate the requirements of subparagraph (A).
"Mainstreaming" is commonly used to refer to the integration of children with disabilities into regular education classrooms. We acknowledge that some educators and authorities prefer the term "inclusion" but nonetheless select the former term it is the general parlance in this Circuit. See *Oberti v. Bd. of Educ. of the Borough of Clementon School Dist.,* 995 F.2d 1204, 1207 n. 1 (3d Cir.1993).

**2.** The Valley Grove School District does not operate its own life skills support program. It is part of a consortium of schools utilizing

testimony was received from Spike's parents and Sally Kissick, a psychologist certified in school psychology.

## A. The Testimony

Martin Aylesworth testified to Spike's educational history. Spike came to the District from an early intervention program and his parents were initially agreeable to life skills placement. Transcript of Due Process Hearing, AR at 129. The Girtys expressed concern in the fall of 1995, however, because Spike was in a fifth and sixth grade program that was not age appropriate for him. Spike was subsequently moved to Rocky Grove Elementary School where he remained in a life skills classroom for academic subjects. An aide accompanied him to his nonacademic subjects in regular education classrooms. While Spike was in third grade, his parents requested greater inclusion, and prior to a scheduled due process hearing, attorneys for both parties agreed to develop an appropriate Individualized Education Program ("IEP")[3] placing Spike in age-appropriate regular education. The following school year, Spike was placed in a regular education fourth grade classroom full-time. AR at 131.

In the spring of 1999, Aylesworth developed a new Comprehensive Evaluation Report ("CER") for Spike that summarized his test results to date. Aylesworth stated that Spike's test results had been consistent over time, and that his achievement was commensurate with his capabilities. Id. at 133. He indicated that Spike was at a pre-readiness level, and that he was able to identify some capital letters, write three of the five letters in "Spike," and rote count from two to five. Spike was unable to match quantity with numerals or to understand sound/symbol relationships. Aylesworth indicated that since entering the District, Spike had made gradual progress. Id. at 134.

According to Aylesworth, Spike did not participate in the fifth grade curriculum, and was in the classroom for socialization purposes only. He stated that it was understood by the parents that the teachers would include Spike in activities, if applicable, but that Spike would not be expected to master the curriculum. Id. at 138. When Spike's parents expressed concern in the fall of 1999 that the sixth grade teachers were not sufficiently adapting the curriculum to meet their son's needs, Aylesworth convened an IEP meeting and found that none of the sixth grade teachers felt it possible to adapt the curriculum to Spike's level. Based on this meeting, he recommended part-time life skills placement and drafted the new IEP to this effect. This IEP has not been implemented. Id. at 140. Aylesworth stated that the life skills classroom would encourage Spike to develop greater independence and would provide him with more resources, such as a certified special education teacher. When asked what supplementary aids and services were available to Spike in regular education, Aylesworth replied that the District permits teachers to go to in-service programs on their own, that an inclusion specialist presented a program to the regular education teachers, and that

---

the Intermediate Units. It contracts with Intermediate Unit 6 for life skills and handicapped support classes.

**3.** The IDEA requires the development of an Individualized Education Program, which is a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining goals appropriate for the child and specifying the services the child is to receive. 20 U.S.C. §§ 1401(a)(2), 1414(a)(5); *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 180–85 (3d Cir.1988), cert. denied, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989).

the teachers can contact the Intermediate Unit ("IU") when they have questions. AR at 145. The sixth grade teachers were told to include Spike as much as possible, but understood that his aide would basically deliver his IEP. *Id.* Spike's behavior in the classroom was not a significant problem. *Id.* at 151. It was Aylesworth's opinion that the disparity between the sixth grade curriculum and Spike's pre-readiness level was so significant that no level of adaptation would permit Spike to gain any benefit from the curriculum. *Id.* at 155.

Susan First was Spike's sixth grade remedial language teacher. She opined that the curriculum could not be adapted to Spike's level, and that it was her understanding that she was to include Spike in activities that he could participate in, but otherwise was to direct his aide to work with him. *Id.* at 177. She also stated that aside from conversations in the hall, she has never consulted with the IU life skills teacher or advisor about presenting the language program to Spike, and that no one from the IU has observed Spike in her class. *Id.* at 180. When asked whether Spike has made any progress in her class, she stated that he has started to write his last name when previously he could only write his first, and that he can read small books when he previously could not, although she believed he memorized the words rather than learned how to read. Spike was not a behavior problem in her class and that there was a group of children who tended to help him. *Id* . at 186.

Linda Bixler was Spike's sixth grade math teacher. She testified that Spike's IEP goals included learning to count to 20, telling time to the hour, and matching number to quantity. She believed that his parents wanted her to adapt the sixth grade curriculum to Spike's level and felt that this was an impossibility. AR at 200.

Similar to First, she had not consulted with the IU life skills teacher or consultant and no one from the IU observed Spike in her classroom. Bixler used kindergarten materials with Spike because Mr. Tantlinger told her that he did not have materials that were appropriate for him. She seldom worked with Spike because she was working with other students on the curriculum that he could not comprehend. When asked whether Spike had made any progress in her class, she replied that he could match numbers above 20 when previously he could only match numbers up to 20. AR at 204. He sat in the back of her classroom and rarely engaged in classroom activities with the other students. AR at 206.

Jeffrey Clark is the principal of Rocky Grove Elementary School, and has participated in all of Spike's IEP meetings but one. AR at 213. According to the IEP current at the time of the hearing, Spike was to receive verbal discipline and, if necessary, a time-out in Clark's office for disruptive behavior. Spike received between 10 and 15 time-outs lasting approximately 10 minutes each in the 1999–2000 school year. He was generally compliant with Clark's directions and was not a significant behavioral concern. AR at 214–216.

Marilyn Frank is Spike's child-specific aide. She has a high school education and is a certified nurse's aide. She testified that she accompanied Spike to his classes except for his specials, such as gym, music, chorus and speech. She worked on his IEP goals with him and said that she received information, direction and recommended materials from the IU. According to Frank, the regular education teachers selected the materials actually used from the recommended materials. She felt that Spike did not function as well when she was not with him because he could not

remain on task without prompting, and also felt that his dependence on her had increased over time. AR at 234. He had made gradual progress on his IEP goals. When asked how his progress was monitored, she replied that he was given a Brigance test once a year, and was given psychological tests.

Timothy P. Tantlinger is a life skills support teacher with the IU. He is not employed by the District. He had difficulty providing materials to Spike's aide because many of his materials were above Spike's level. AR at 259. It was his opinion that it would not have been possible to adapt the sixth grade curriculum to a level where Spike could benefit; he also felt that inclusion was less important for older disabled children than younger ones because the older children have fewer similarities to their non-disabled peers and are often left behind. AR at 263. He could not think of any supplemental aids or services that might further assist Spike. He felt that Spike could be more independent than he was, and that many things taught in life skills could not be taught by Spike's aide in a regular education classroom. Spike was functioning below the level of Tantlinger's life skills students, and would require individualization and an adapted curriculum if placed in it. AR at 272. Marilyn Snyder, an instructional advisor with the IU, said that she often worked directly with Spike during his fourth grade year because that was the first year he was fully included with an aide, and she worked with them on the transition. AR at 281. It was her opinion that life skills placement would best suit Spike's needs because he would be taught by a special education teacher having experience with mentally retarded children. She also stated that Spike would be able to participate more in a life skills classroom, and would likely feel more successful as a result. She did not think that being with nondisa-

bled peers was as important as it had been when Spike was younger. AR at 295.

Spike's father, Charles Girty, requested that a curriculum be adapted for Spike at the December 1999 IEP conference. AR at 322. He did not necessarily want the adapted curriculum to be a sixth grade one, but did want Spike to have something to learn about in every class. It was his impression that Spike was often assigned to work on the same "papers" over and over. Vicky Girty, Spike's mother, testified that Spike enjoyed school and liked his aide and teachers. AR at 345. Spike was especially proud of several accomplishments in his sixth grade year including a map of Canada and insect and seed collections. She stated that since being in regular education, Spike had developed friendships and that his language and social behavior had improved. AR at 351. Spike could also recognize letters and numbers, which he could not do in life skills, and was able to write his first name. She felt, however, that too few adaptations had been made. Spike had nothing to do, for instance, in his science and social studies classes after the beginning of the year. On his sixth grade report card, Spike received "improving" marks in most areas and "satisfactory" marks in the rest. He did not receive any "needs improvement" or "unsatisfactory" marks.

Sally Kissick was called by the Plaintiffs as an expert witness. She is a licensed school psychologist who evaluated Spike in 1995, and saw him in 1997 and 1999. AR at 371. She felt that additional beneficial changes could have been made to the regular education setting. For instance, she opined that Spike's child-specific aide did not need to accompany him to homeroom. AR at 377. Based on her observations, Kissick felt that Spike behaved appropriately in this room and that the teacher could have adequately dealt with him with-

out the aide. She found that the other children were more likely to interact with Spike when the aide was not around, and felt that the aide had not been instructed on how to help Spike learn independence. As one example, she stated that Spike's assigned task of taking the daily attendance cards to the cafeteria could have been used to teach him how to travel independently but was not. She also felt that collaboration between the special education teacher and the regular education teachers would have been beneficial and indicated that co-teaching could occur without the special education teacher being present in the classroom. AR at 399. With respect to Spike's progress, Kissick concluded that based on his intelligence and achievement tests, he was achieving at his level. AR at 390.

### B. The Administrative Decisions

On May 26, 2000, the hearing officer issued his decision that the proposed placement was not in accordance with IDEA and ordered the District to deliver Spike's IEP in an inclusive education setting and to provide timely training for its staff on inclusive practices. Hearing Decision, AR at 60–69. He stated that although Spike was in classes with less than ten students for language and math, he was not instructed in an inclusive manner. AR at 64. Spike's school day contained no planning as to how his IEP goals could be integrated into the regular education instruction and activities. The teachers were not trained in inclusion and did not consult with the special education teacher. AR at 65. There was no coordinated planning by the District to assess Spike's progress or

to train his child-specific aide. He concluded that the District had not provided supplemental aids and services as required by *Oberti v. Bd. of Educ. of the Borough of Clementon School Dist.*, 995 F.2d 1204 (3d Cir.1993) and had not demonstrated that it provided sufficient training in inclusion according to 34 C.F.R. § 300.555.[4]

The District filed exceptions to this decision, the parents answered, and on July 12, 2000, the Appeals Panel reversed the Hearing Officer's decision. Appeals Panel Decision, AR at 105–112. The Panel found that the sixth grade regular education curriculum was so far beyond Spike's level that it could not be modified to meet his needs. AR at 110. It indicated that the District complied with the supplementary aids and services requirement by providing: 1) regularly scheduled consultations between Spike's aide and an IU life skills teacher; 2) appropriate instructional materials and methods to the aide; and 3) inservices and consultations on inclusion for the regular classroom teachers. AR at 111. The Panel also stated that Spike's parents had many goals for him that could not be met in a regular education placement, and that his educational program was inadequate because it was being presented by an aide rather than by a teacher. This appeal followed.

## II. DISCUSSION

### A. The Oberti Test

The core of the IDEA is the requirement that states receiving federal assistance have in effect a policy that "assures all children with disabilities the right to a

4. This regulations provides that:
   [e]ach SEA shall carry out activities to ensure that teachers and administrators in all public agencies—
   (a) Are fully informed about their responsibilities for implementing § 300.550 (relat-

ing to the least restrictive environment or "mainstreaming" requirement); and
   (b) Are provided with technical assistance and training necessary to assist them in this effort.

free appropriate public education." 20 U.S.C. § 1412(1). In order to comply with this requirement, *inter alia*, recipient states must specifically establish:

> procedures to assure that, to the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B). As indicated in footnote 1 above, this is commonly referred to as the "mainstreaming" requirement. Our standard of review is set forth in 20 U.S.C. § 1415(i)(2), which provides in relevant part that:

> (A) In General. Any party aggrieved by the findings and decision made . . . shall have the right to bring a civil action . . . which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.
>
> (B) Additional requirements. In any action brought under this paragraph, the court—
>
> (i) shall receive the records of the administrative proceedings;
>
> (ii) shall hear additional evidence at the request of a party; and
>
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

In *Oberti v. Bd. of Educ. of the Borough of Clementon School Dist.*, 995 F.2d 1204 (3d Cir.1993), the United States Court of Appeals for the Third Circuit adopted a two-part test for determining whether a school is in compliance with the mainstreaming requirement. The first part of the test is a determination as to whether "education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." *Id.* at 1215 (*quoting Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989)). Analysis of this part requires the consideration of several factors, including: 1) whether the school has made reasonable efforts to accommodate the child in a regular classroom; 2) the educational benefits available to the child in a regular classroom with supplementary aids and services, as compared to the benefits provided in a segregated special education classroom; and 3) the possible negative effect the child's inclusion may have on the education of the other children in the regular classroom. *Id.* at 1217–18. If it is determined that placement outside the regular classroom is required, then the court must address the second part of the test, which is a determination as to whether the school has "mainstreamed the child to the maximum extent appropriate." *Id.* at 1215 (*quoting Daniel R.R.*, 874 F.2d at 1048). This analysis requires an inquiry into whether the school has made efforts to include the child in school programs with nondisabled children whenever possible. *Id.*

In *Oberti*, the Third Circuit also set forth the applicable burden of proof. In order to prevent the district court from acting on its own view of preferable education methods, there is an obligation to accord due weight to the administrative proceedings. *Id.* at 1219. This obligation requires us to consider the administrative findings of fact but permits us to accept or reject them. *Id.* (*citing Jefferson County Bd. of Educ. v. Breen*, 853 F.2d 853, 857 (11th Cir.1988)). The Third Circuit expounded on this obligation in *Carlisle Area*

*School v. Scott P.,* 62 F.3d 520, 529 (3d Cir.1995), *cert. denied,* 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996), stating that when the appeals panel reverses the hearing officer, as is the case here, the due weight obligation applies to the appellate proceedings so long as non-testimonial, extrinsic evidence justifies the appeals panel's contrary decision. Notwithstanding the due weight obligation, because of the IDEA's purposes and practical considerations, it is the school's burden to prove compliance with the mainstreaming requirement. *Oberti,* 995 F.2d at 1219. It is appropriate to decide this case on summary judgment.[5]

*B. Application of Oberti to this Case*

■ We proceed now to consider the three factors under the first part of the *Oberti* test. With respect to the first factor, whether the District made reasonable efforts to accommodate Spike in regular education, we note that this obligation is substantial. Under *Oberti,* the school is required to " 'consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction,' speech and language therapy, special education training for the regular teacher, behavior modification programs, or any other available aids or services appropriate to the child's particular disabilities." *Oberti,* 995 F.2d at 1216 (*quoting Greer v. Rome City School Dist.,* 950 F.2d 688, 696 (11th Cir.1991)). The school is required to make efforts to modify the regular education program to accommodate a disabled child. *Id.* (*citing* 34 C.F.R. Part 300, App.C, Question 48). The IDEA " 'does not permit schools to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad.' " *Oberti,* 995 F.2d at 1216 (*quoting Daniel R.R.,* 874 F.2d at 1048).

In this case, the Appeals Panel concluded that the District complied with the mainstreaming requirement because it provided: 1) regularly scheduled consultations between Spike's aide and an IU life skills teacher; 2) appropriate instructional materials and methods to the aide; and 3) inservices and consultations on inclusion for the regular classroom teachers. AR at 111. According to Spike's April, 1999 IEP, the most recent IEP actually implemented, Spike was to receive the following "program modifications and specially designed instruction:" a child specific aide, material at his instructional level, consultation with the IU life skills teacher, and a computer with software. IEP dated April 29, 1999, AR at 14. Aylesworth testified that the District permits teachers to go to in-service programs on their own, that an inclusion specialist presented a program to the regular education teachers, and that the Intermediate Unit ("IU") is available to answer teachers' questions. AR at 145.

After careful review of the record, we find that the District failed to give the requisite consideration to including Spike

---

**5.** Whether the District provided Spike with a free appropriate public education is a mixed question of law and fact. *Mavis v. Sobol,* 839 F.Supp. 968, 987 n. 32 (N.D.N.Y.1993) (citing cases). However, because cases brought under 20 U.S.C. § 1415(e) require that the full administrative record be placed before the district court, the familiar concern over whether the record is sufficiently developed to permit summary judgment generally is not present. *Id.* (citing *Bertolucci v. San Carlos Elementary School Dist.,* 721 F.Supp. 1150, 1153 (N.D.Cal.1989)). That is the case in this instance. The parties have stipulated that the record is complete and there are no historical facts in dispute that relate to the appropriateness of Spike's program. Transcript of Proceedings, Argument on Motions for Summary Judgment at 3–4. The differences that exist concern judgments and conclusions and do not implicate credibility. See *Bertolucci,* 721 F.Supp. at 1153.

in regular education with supplementary aids and services. From Spike's initial full-time placement in regular education in the fourth grade, the District assigned essentially all responsibility for his education to his aide, who is not a teacher. The regular education teachers themselves never consulted with anyone from the IU, and received no special education training or support. It was their understanding that the primary, if not entire, responsibility for working with Spike on his IEP goals rested with the aide. Because they were not provided with adequate special education training, they were in not in a position to modify the curriculum or to mainstream Spike into the classroom. *See Mavis v. Sobol*, 839 F.Supp. 968, 989 (N.D.N.Y.1993) (citing *Oberti*). Thus, while Spike's teachers included Spike when they identified something for him to do in a planned activity, they were in no position to, and consequently did not, make meaningful attempts to include him. The aide herself only received "a crash course in special ed" from the IU consultant in the first year she worked with Spike, and the Plaintiffs' expert testified that in some instances, the aide may have actually impeded Spike's inclusion. AR at 286, 377. Furthermore, there was no systematic supervision of the aide to reveal whether this or other problems existed. Thus, while the District placed Spike in a regular education setting and provided him with an aide and materials, it did not meaningfully attempt to instruct him inclusively as required under the IDEA. As made clear by the Third Circuit in *Oberti*, mainstreaming requires far more than the physical placement of a disabled child in a regular education classroom. *Oberti*, 995 F.2d at 1207 n. 1.

The second factor under *Oberti* is a comparison between the educational benefits the child will receive in regular edu-

cation with supplementary aids and services and the benefits the child will receive in a segregated, special education classroom. *Oberti*, 995 F.2d at 1216. In *Oberti*, the Court indicated that this analysis requires heavy reliance on the testimony of experts, but also admonished that special attention must be paid to unique benefits, such as the development of social and communication skills from interaction with nondisabled students, that the child may obtain in regular education that would be unavailable in a special education classroom. *Id.* Importantly, the fact that the child may make greater academic progress in the segregated setting may not warrant removal of the child from regular education; a disabled child may benefit differently from regular education than nondisabled students. *Id.* at 1217.

In this case, a strict comparison is impossible because the District did not provide the requisite supplementary aids and services to Spike. Nonetheless, every school official, teacher and expert who testified indicated that Spike made academic progress in regular education. Aylesworth and Kissick both stated that Spike's level of achievement was commensurate with his abilities according to his achievement tests. Spike's sixth grade language and math teachers each identified specific areas in which he had improved, and his child-specific aide testified that he made gradual progress on his IEP goals. With respect to unique, nonacademic benefits, Spike's mother testified that Spike developed friendships and improved his language and social behavior while in regular education.

The Appeals Panel found that the sixth grade regular academic curriculum was so far beyond Spike's level that it could not be modified to meet his needs, and that Spike had many other needs due to his high level of impairment that would not be

met in a regular education setting. AR at 110–111. This conclusion fails to take into account the undisputed testimony that Spike did in fact progress both academically and socially in regular education and was achieving at a level appropriate for him. In *Oberti*, the Third Circuit stressed that the IDEA does not require disabled children to receive the same educational experience as nondisabled children, and recognized that disabled children may benefit from regular education differently than nondisabled children. *Oberti*, 995 F.2d at 1217. Stated differently, the relevant focus is whether Spike can progress on his IEP goals in a regular education classroom with supplementary aids and services, not whether he can progress at a level near to that of his non-disabled peers. *Mavis*, 839 F.Supp. at 987. Thus, the Appeals Panel's focus on the gap between Spike's abilities and the demands of the sixth grade curriculum was erroneous.

The record indicates that the District largely based its recommendation of life skills placement on the opinions of Spike's regular education teachers that the sixth grade curriculum could not be modified to permit Spike to obtain any benefit from it. As discussed above, however, his teachers were never adequately trained in modification techniques or methods. There was substantial testimony from the Plaintiffs' expert that simple techniques exist which could be used to facilitate Spike's inclusion in regular education instruction. This expert also opined that with a small amount of research into the methods that many school districts already use, a program beneficial to Spike could be developed. The IU life skills teacher and consultant felt that a life skills placement was preferable because Spike would learn greater independence and would have the benefit of a certified special education teacher in life skills. Plaintiffs' expert, however, identified ways that Spike could be taught independence in a regular education setting and discussed the concept of co-teaching, in which a special education teacher collaborates with the regular education teacher but is not necessarily present in the classroom. Given that these methods have not been attempted and that Spike has progressed in regular education even without appropriate supplements, we find that Spike would receive adequate educational benefit in a regular education setting with appropriate supplementary aids and services.

The final factor under the first part of the *Oberti* test is whether the child's inclusion is likely to have a negative effect on the education of the other children in the classroom. *Id.* The record is clear in this case that Spike is not disruptive, and the District has conceded that Spike is not a behavioral problem and that this factor is not an issue. Transcript of Proceedings held June 7, 2001, Argument on Motions for Summary Judgment at 9. We note, furthermore, that Spike's sixth grade language teacher testified that a group of students tended to help Spike. In *Oberti*, the Court acknowledged expert testimony that nondisabled students may also benefit from the inclusion of a disabled child in regular education. In this case, First agreed that some students in her class had shown compassion toward Spike, and stated that his presence in the classroom had not been a hindrance.

Our application of the first part of the *Oberti* test reveals that the District has not met its burden of proving by a preponderance of the evidence that Spike could not be educated satisfactorily in a regular education setting with supplementary aids and services. In light of our conclusion on this issue, we have no need to apply the second part of the test, which relates to whether a school justified in removing a disabled child from regular education has

taken the requisite steps to mainstream that child to the maximum extent appropriate. *Oberti*, 995 F.2d at 1215. We note, however, that if the District recommends life skills placement for Spike in a future IEP and satisfies its burden under the first part of the *Oberti* test at that time, it would be obligated to comply with the second part of the test as well.

### C. Relief

Based upon the foregoing, the District may not implement its most recent IEP, which calls for Spike to be placed in life skills support for academic classes. The District is required to reconsider its position on inclusion for Spike, giving the requisite consideration to the whole range of available supplementary aids and services. Importantly, our decision does not require the District to implement Spike's previous IEP, which provided for full-time placement in regular education. It does, however, require the District to develop an IEP that fully complies with IDEA's mainstreaming requirement.

### ORDER

AND NOW, this 17th day of September, 2001, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 7] is GRANTED and Defendant's Motion for Summary Judgment [Doc. No. 9] is DENIED.